**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 24-cv-1396 |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| CITY OF CHICAGO, CHICAGO POLICE | ) | Judge Lindsay C. Jenkins |
| OFFICERS NICHOLAS EVANGELIDES | ) | Magistrate Judge Young B. Kim |
| (#20526), DALE POTTER JR. (#21649), , | ) | |
| SCOTT REIFF (#20847), BRIAN RONEY | ) | |
| (#2241), and MARC LAPADULA (#21158). | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |

### THIRD AMENDED CIVIL RIGHTS COMPLAINT FOR DAMAGES

Plaintiff MICHAEL WILLIAMS files this complaint for damages against the CITY OF

CHICAGO, as well as CHICAGO POLICE DEPARTMENT OFFICERS NICHOLAS

EVANGELIDES (#20526), DALE POTTER JR. (#21649), SCOTT REIFF (#20847), BRIAN

RONEY (#2241), and MARC LAPADULA (#21158) in their individual capacities, and allege as

follows:

### INTRODUCTION

1.     Plaintiff Michael Williams spent 11 months in the Cook County Jail because CPD

officers falsely accused him of murder.

2.     Mr. Williams seeks damages for the 11 months that were robbed from him and

the physical, medical, and emotional harms that he suffered while jailed on false charges.

**JURISDICTION AND VENUE**

3.      This Court has jurisdiction over Plaintiff's federal claims for damages and injunctive relief pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The Court has jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same facts and form part of the same case as the federal claims.

4.      Venue is proper in the United States District Court for the Northern District of Illinois under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the Plaintiff's claims occurred in this district. Venue is also proper under 28 U.S.C. § 1391(a) because one or more Defendants reside in this District and, on information and belief, all Defendants are residents of the State in which the District is located.

**PARTIES**

*Plaintiff*

5.      Plaintiff MICHAEL WILLIAMS is a 67-year-old grandfather and resident of the South Shore neighborhood in Chicago. Mr. Williams was falsely accused of first-degree murder. He remained incarcerated in the Cook County Jail for 11 months until July 23, 2021, when the Cook County State's Attorney's Office dismissed the charges against him after conceding that it could not use ShotSpotter evidence against him and that it "ha[d] insufficient evidence to proceed with the prosecution."

6.      Individual Plaintiff Michael Williams seeks compensatory and punitive damages as a result of the Defendants' misconduct.

*Municipal Defendant*

7.      Defendant CITY OF CHICAGO ("City") is and at all times mentioned herein was a municipality organized and operating under the statutes of the State of Illinois. It is authorized

2

under the statutes of the State of Illinois to maintain the CHICAGO POLICE DEPARTMENT, which acts as the City's agent in the areas of municipal law enforcement, and for which the City is ultimately responsible. Defendant City was, at all times material to this Complaint, the employer and principal of the individual Defendant Officers.

***Williams Defendant Officers***

8.      Defendants Detective NICHOLAS EVANGELIDES (#20526), Detective DALE POTTER JR. (#21649), Detective SCOTT REIFF (#20847), Sergeant BRIAN RONEY (#2241), Detective MARC LAPADULA (#21158), are City of Chicago employees with the CPD. At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the CPD. Each one of them participated in the investigation of Mr. Williams' case and contributed to his arrest and detention on false charges of murder. Each one is sued in his or her individual capacity for violating the rights of Mr. Williams under the Constitution and Illinois law.

## FACTUAL ALLEGATIONS

***The Events of May 31, 2020***

9.      Plaintiff Michael Williams was falsely arrested for murder and spent nearly a year in the Cook County Jail.

10.      The evening of May 31, 2020 was a turbulent one in Chicago. Six days earlier, police officers in Minneapolis had murdered George Floyd. Video of his murder had spurred uprisings nationwide, including in Chicago.

11.      That night, Mr. Williams and his wife had gone to a relative's house for dinner. After returning home to his apartment in the South Shore neighborhood, Mr. Williams went out for a drive. He intended to buy cigarettes at a gas station near East 76th Street and S. South

Chicago Ave. He found that the gas station had been broken into. Mr. Williams turned his car around, heading east back in the direction of his home.

12.     Mr. Williams was not armed, nor does he own a gun.

13.      On his way east, around 11:40 p.m. or thereabouts, Mr. Williams passed the parking lot of an AutoZone located near E. 76th Street and S. Stony Island Avenue. Mr. Williams was driving with his front window down because he did not feel particularly well and needed the fresh air. A young man in the AutoZone parking lot waved down Mr. Williams and asked him for a lift to where he was staying, about 15 blocks north in the Woodlawn neighborhood. Mr. Williams obliged.

14.     It was not unusual when Mr. Williams agreed to give the young man a lift home that night.

15.     Mr. Williams is a 65-year-old man with three children and multiple grandchildren. While he and his fiancée are of modest means, they are generous and community-minded. They frequently donate bags of groceries to needy people in the neighborhood and take people into their home to provide meals. They also regularly pick people up off the streets to give them rides when they need it.

16.     Mr. Williams did not know who the young man was. He believed he recognized him from seeing him around the neighborhood but had never spoken to him and did not know anything about him.

17.     Mr. Williams left the AutoZone parking lot, heading northbound to take the young man home. Mr. Williams' front window remained down.

4

18.     A few minutes later, they were continuing north along S. Stony Island Ave, and stopped at a red light at 63rd Street. Without warning, a bullet came through the open car window.

19.     Mr. Williams slumped down in his seat, terrified that he might be struck by gunfire.

20.     Mr. Williams hollered at his passenger, asking if he was alright. Mr. Williams soon realized that his passenger had been shot. Mr. Williams hit the gas to race away from danger.

21.     Mr. Williams did not see where the fatal gunshot came from, but he did perceive that there was a vehicle in the next lane, immediately to his left, when the shot was fired.

22.     Terrified that there could be more gunshots, Mr. Williams sped through the intersection at E. 63rd Street, still heading northbound. Soon thereafter, he pulled a U-turn, intent on getting his passenger to the nearest hospital he could think of.

23.     Mr. Williams pulled up to the St. Bernard Hospital emergency room to get help for his passenger. Hospital staff received the wounded young man. Mr. Williams left his parked car and walked into the lobby of the hospital.

24.     Mr. Williams attempted to speak with hospital staff. A hospital staff member told him that he could not stay because he was not next-of-kin and COVID protocols prohibited visitors. He provided his name and information to a hospital security guard before leaving.

25.     The wounded young man died from the gunshot wound approximately two days after he was shot.

26.     The events of that evening were extremely traumatic for Mr. Williams. The shooting had put him in mortal fear for his own life. He was distraught about his passenger.

Because of the trauma of that evening, he avoided driving his car thereafter, for fear that he might be targeted again by the people who had shot into his car. He left the car parked on the street outside his apartment, where police soon found it and towed it for processing and investigation.

***The Police Investigation***

27. On June 1, 2020, hours after the young man was received in the hospital, CPD detectives began an initial investigation, interviewing potential witnesses, requesting video footage, and taking other investigative steps.

28. Defendant Sergeant Brian Roney (#2241) assigned follow-up on the shooting investigation to Defendant Detective Nicholas Evangelides (#20526).

29. Over course of the subsequent days, Defendants Evangelides, and other CPD officers interviewed various members of the victim's family. They also conducted interviews of the victim's girlfriend and other friends or acquaintances who had been with the victim earlier in the evening.

30. Police learned that the victim had apparently borrowed another person's cellphone to try to call for a ride home. His mother told police that she had received a call from that number at 11:25 p.m. but that she did not answer the call.

31. Defendant Detective Dale Potter Jr. (#21649) obtained several search warrants to search the victim's Facebook account as well as the cell phone records of the phone that he had apparently used to call for a ride.

32. Nothing in any of these interviews, cell phone records, Facebook records, or other investigative steps suggested any link at all to Mr. Williams. The evidence regarding the victim's phone call suggest that he did indeed need a ride home, which Mr. Williams tried to provide.

33.     The Williams Defendant Officers failed to conduct obvious investigative inquiries into the victim's shooting death, including that he might have been intentionally targeted. They learned, for example, that the victim's mother had information that the victim may have been intentionally "set up" to be killed. The Williams Defendant Officers did not pursue this lead. Moreover, upon information and belief, had the Williams Defendant Officers conducted a good faith investigation, they would have learned that the victim had survived an assault at a bus stop two weeks earlier and was staying with a relative for his personal safety. The Williams Defendant Officers reported no follow-up of this.

34.     Instead, the Williams Defendant Officers worked together to charge and prosecute Mr. Williams, without cause, based on shoddy ShotSpotter evidence.

35.     On June 4, 2020, Scott Brownley of the Area One Technology Center gave Defendants Evangelides and Roney a copy of ShotSpotter Investigative Lead Summary, Incident Report No. 778-13539 (the "ShotSpotter Report" or "Initial ShotSpotter Report"). The ShotSpotter Report purported to identify a single gunshot at 11:46 p.m. near the intersection of E. 63rd Street and S. Stony Island Avenue.

36.     The ShotSpotter Report included a map with a pin located in the northbound lane of S. Stony Island Avenue. It also included a large round circle that encompassed much of the intersection and surrounding area, reflecting the 82-foot margin of error that ShotSpotter provides for its alerts.

37.     Ignoring the fact that the report suggested the shot may have occurred anywhere within an 82-foot radius, the Williams Defendant Officers instead fixated on the precise location of the pin on the ShotSpotter Report as the place where the fatal shot was fired. In a detailed Case Supplementary Report recounting the entire investigation, Defendant Evangelides falsely

7

wrote that "Shot Spotter technology pinpointed the gunshot's exact location and determined the fired shot's origin was in the northbound lane of Stony Island just south of 63rd Street." The Defendant Officers repeated this false claim throughout their investigation of Mr. Williams in reports and interviews.

38.     The Williams Defendant Officers relied on this false evidence to charge Mr. Williams with the crime. They did so knowing that the ShotSpotter report did not and could not "pinpoint[] the gunshot's exact location."

39.     The Initial ShotSpotter Report that the Williams Defendant Officers relied on itself warns repeatedly that it should not be relied upon in this way. It states that "locations were automatically calculated by the ShotSpotter system at the time of detection. They are approximate and should be deemed as such." The same document provides an explicit "Disclaimer" that "this summary should only be used for initial investigative purposes because the shot timing, location, and count could differ once reviewed by a ShotSpotter Forensic Engineer." The Disclaimer further warns that a "weapon discharge in an enclosed space" may affect the ability of sensors to properly detect gunshots. The Disclaimer concludes by warning that "the data and conclusions herein should be corroborated with other evidentiary sources such as recovered shell casings and witness statements."

40.     The Williams Defendant Officers intentionally disregarded each of these warnings in their investigation of the shooting, claiming that the Initial ShotSpotter Report could pinpoint the "exact location" of the supposed gunshots.

41.     The Williams Defendant Officers also ignored the fact that ShotSpotter's materials explicitly state that its initial reports only provide the location of supposed gunshots within an 82-foot radius. The Initial ShotSpotter Report that the Williams Defendant Officers

relied on itself showed a large circle on the map clearly showing the margin of error around the pin on the map.

42.     The Williams Defendant Officers also disregarded an obvious error in the Initial ShotSpotter Report. That report listed the street address of the supposed gunshot at 5700 S. Lake Shore Drive, more than one mile away from the dot on the map and GPS coordinates in the report. The Williams Defendant Officers should have known from this error that ShotSpotter locations are not "exact."

43.     On information and belief, the Williams Defendant Officers also knew the ShotSpotter location was inaccurate from their past experience investigating ShotSpotter alerts, in which they learned that the dot on the map is not an exact location for gunfire.

44.     Yet, the Williams Defendant Officers ignored multiple red flags in the Report, ShotSpotter's own warnings, and their past investigative experience in order to pursue a false murder case against Mr. Williams.

45.     The Williams Defendant Officers, now focused on the dot on the map in the ShotSpotter Report as the location of the shot, pulled surveillance video footage near the time and place of the ShotSpotter alert. No video shows the shooting. One video shows the intersection adjacent to the ShotSpotter alert but does not encompass the specific location of the pin on the ShotSpotter report.

46.     That video shows there was a black sedan that appears to be a Dodge Charger in the left-turn lane immediately adjacent to where Mr. Williams' vehicle was stopped (off camera but with the light from its headlights visible on the pavement) around the time when the ShotSpotter alert registered a supposed gunshot. The video shows the black Charger creeping forward past Mr. Williams' car into the crosswalk and stopping briefly before suddenly speeding

away to make a left turn through a red light. Moments later, Mr. Williams' car comes into view, accelerating straight through the intersection.

47.     The Williams Defendant Officers proceeded to seize Mr. Williams' car, but they made no effort to talk to him or to track down the black sedan at the scene of the shooting. The Williams Defendant Officers had multiple tools at their disposal that they could use to try to track down the black sedan, but they made no effort to use any of those tools. They made no effort to track down the black sedan because they were not interested in learning the facts of the shooting. They wanted to close the case on Mr. Williams instead.

48.     Nothing in the video or any other evidence ruled out the black sedan as the source of the fatal gunshot.

49.     Neither the ShotSpotter Report nor the video footage demonstrated that the shot was fired from inside Mr. Williams' car. Neither was sufficient to supply probable cause of that theory of the crime.

50.     The Williams Defendant Officers either failed to request or requested and then suppressed a ShotSpotter "Detailed Forensic Report," which is a post-processing analysis from ShotSpotter engineers. The Detailed Forensic Report for the ShotSpotter alert at issue in this case puts the gunshot closer to the black sedan in the left turn lane, supporting Mr. Williams' account that the fatal shots were fired from the black sedan.

51.     The Williams Defendant Officers also intentionally ignored evidence that contradicted their theory of the case—for example, that there was no evidence of close-range gunfire on the body. The Williams Defendant Officers also ignored and suppressed evidence pointing to an alternate suspect—for example, evidence that a 2019 black Dodge Charger was carjacked by two armed gunmen at 6600 S. Stony Island (just three blocks away from the

10

shooting) approximately 40 minutes prior to the shooting. The carjacked 2019 black Dodge
Charger was set on fire and abandoned near 72nd and Jeffery Streets within one hour after the
shooting.

52.     On August 28, 2020, nearly three full months after the shooting, the Williams
Defendant Officers decided to talk to Mr. Williams. They sent other CPD officers to Mr.
Williams' home and asked him to come to the police station for questioning. They told him he
was not under arrest and that police just wanted to ask him questions.

53.     The CPD officers took Mr. Williams to the police station at 51st and Wentworth
Avenue where Detectives Evangelides, Potter, and Reiff proceeded to interrogate Mr. Williams.

54.     During the interrogation, Defendants Evangelides, Potter, and Reiff lied to Mr.
Williams repeatedly, claiming to have evidence of Mr. Williams' guilt that they did not have.
They also ignored Mr. Williams' claims of innocence and attempted to manufacture probable
cause by trying to manipulate him into making inculpatory statements.

55.     Despite no physical evidence implicating him in the crime, the Williams
Defendant Officers arrested Mr. Williams on the evening on August 28, 2020 and requested that
Cook County prosecutors approve murder charges against Mr. Williams.

56.     Mr. Williams was held in police lockup for two nights before he saw a judge.

57.     On August 30, 2020, Cook County prosecutors approved the Williams Defendant
Officers' request for murder charges. On information and belief, prosecutors' decision to
approve murder charges against Mr. Williams was based on false, incomplete, and/or misleading
information that the Williams Defendant Officers supplied to them.

58.     The formal Probable Cause Statement for Judicial Determination, signed by
Defendant Potter at 11:40 a.m. on August 30, 2020, also provided false information.

11

59.    Most significantly, the Probable Cause Statement asserted that "[t]he investigation revealed that the gunshot had come from within the vehicle." This assertion was false. There was no evidence that the gunshot had come from within the vehicle.

60.    The Defendant Officers never identified any motive for the crime. They never identified any prior connection between Mr. Williams and the victim. They never recovered any weapon or physical evidence whatsoever to support the charges. They never identified any eyewitnesses or circumstantial witnesses to support their charges. They had no video evidence establishing that the fatal gunshot was fired from inside Mr. Williams' vehicle. They ignored evidence tending to show that the gunshot could not have come from inside the car.

61.    The Defendant Officers engaged in tunnel vision to target Mr. Williams, arresting him for first-degree murder, without probable cause. As a result, they never identified the true perpetrator of the murder.

62.    On August 29, 2020, the Defendant Officers asked Cook County prosecutors to approve first degree murder charges against Mr. Williams.

63.    On information and belief, Defendant Officers concealed, suppressed, or otherwise failed to provide exculpatory information to prosecutors, including information pointing to specific alternative suspects that Defendant Officers had failed to investigate because of their single-minded and bad faith effort to procure charges against Mr. Williams.

64.    On information and belief, the Defendant Officers provided false, incomplete, and/or misleading information to prosecutors.

65.    Prosecutors approved charges and conducted the grand jury proceedings against Mr. Williams in reliance on the bad faith investigation conducted by the Defendant Officers,

12

false and misleading information provided by Defendant Officers, and without exculpatory information concealed, suppressed, or otherwise not provided by the Defendant Officers.

***Court Proceedings and the Ultimate Dismissal of Charges***

66.     On August 30, 2020, Defendant Evangelides signed a sworn felony complaint against Mr. Williams, stating that Mr. Williams committed first degree murder by shooting Safarian Herring without lawful justification.

67.     On August 30, 2020, Mr. Williams had his first court appearance for a probable cause hearing. Defendant Officer Potter presented his false Probable Cause Statement to the Court at the hearing. Defendant Potter also made misleading statements to the Court to imply Mr. Williams' guilt and to further advance investigators' false assertion that the evidence showed that the shot was fired inside Mr. Williams vehicle.

68.     On the basis of Defendant Officer Potter's false Probable Cause Statement and misleading testimony, the judge determined that there was probable cause against Mr. Williams.

69.     On September 22, 2020, the Grand Jury issued an indictment against Mr. Williams for first-degree murder. The only witness listed on the Indictment was Defendant Officer Evangelides, who also presented false and misleading testimony.

70.     Mr. Williams was eventually assigned counsel from the Cook County Public Defender Office. His attorneys mounted a vigorous defense and issued numerous subpoenas seeking to interrogate the reliability and admissibility of the ShotSpotter evidence that was central to the State's case.

71.     On April 22, 2021, Mr. Williams' defense attorneys filed a Motion to Exclude ShotSpotter Evidence Pursuant to *Frye* and Rule 403. The motion sought an evidentiary hearing

to ascertain, for the first time, the reliability of ShotSpotter evidence in Cook County and whether it should be excluded under *Frye* standards.

72.     As a result of Mr. Williams' motion, the State's Attorney's Office realized that the ShotSpotter provided no evidence of Mr. Williams' guilt. On June 11, 2021, the State's Attorney Office chose to withdraw the ShotSpotter evidence, rendering moot the challenge to ShotSpotter's reliability. Mr. Williams' counsel informed the Court that he would be seeking dismissal because ShotSpotter was central to the finding of probable cause and had been presented to the Grand Jury.

73.     At the next court date, on July 23, 2021, the Assistant State's Attorney moved to dismiss the charges. He reiterated the prior decision "not [to] use ShotSpotter evidence in this particular case." He then explained, "We have since conducted a thorough reevaluation of the evidence in this case. All the video that was collected by the Chicago Police Department, statements taken, circumstantial evidence, we requested some additional forensic testing during our analysis, and after that review, Judge, it was our determination that we have insufficient evidence to proceed with the prosecution of Mr. Williams."

74.     The Assistant State's Attorney moved for dismissal of the charges, *nolle prosequi*. The Court granted the motion.

75.     The Assistant State's Attorney also confirmed, in response to questions from the Court, "that ShotSpotter evidence was used before the Grand Jury in getting the indictment."

76.     Mr. Williams was released from the Cook County Jail on the evening of July 23, 2021, nearly 11 months after his unlawful arrest.

14

***The City's ShotSpotter Policies and Customs***

77.     The City has adopted and maintained express policies and widespread practices concerning ShotSpotter—as well as explicit decisions of officials with final policymaking authority—that lead systematically to illegal searches and seizures.

78.     The City's ShotSpotter Flex Program policy conveys to officers, including the Defendant Officers, a false sense of ShotSpotter's precision, directing them to investigate "the precise location" provided by ShotSpotter, as well as the area surrounding the "precise location given by ShotSpotter information." The City has failed to train the Defendant Officers about the inaccuracy of the locations provided by ShotSpotter alerts, and the fact that all locations provided by ShotSpotter are at best approximations.

79.     The City's practice, policies, and training affirmatively mislead officers about the accuracy and precision of ShotSpotter alerts. The City failed to train the Defendant Officers in this regard.

80.     The City's practice, policies, and training fail to inform officers that the locations provided by ShotSpotter are not exact but at best approximate. The City failed to train the Defendant Officers in this regard. The City's practice, policies, and training fail to provide proper guidance about whether or when ShotSpotter alerts may justify a search or seizure. The City failed to train the Defendant Officers in this regard.

81.     The City's express policy requires officers to rely on ShotSpotter alerts when investigating any type of shooting incident and to rely on ShotSpotter reports for investigation and prosecution purposes.

82.     The City, by express policy and practice and through its decisionmakers, has failed to test the ShotSpotter system to determine the accuracy of its location determinations.

15

83.     The City knows that the system has never been tested in Chicago or elsewhere to assess its reliability.

84.     The City knows about the lack of studies and testing because they have been confronted about it directly in City Council, the Public Safety Committee, and other forums; because it has been widely publicized in national news reports; and because they have themselves declined to permit or conduct deployment qualification testing—or any other testing—of the system in Chicago.

85.     The City knows, based on public testimony in City Council and the experience of its own employees, that Cook County prosecutors drop cases involving ShotSpotter evidence and avoid defending the system's reliability in court when it is challenged in criminal cases.

86.      Brandon Johnson, the current Mayor of the City of Chicago, has personal knowledge of the harms and legal violations that the City's use of ShotSpotter causes.

### PLAINTIFF WILLIAMS' CLAIMS

### COUNT I – 42 U.S.C. § 1983
### Violation of the Fourth and Fourteenth Amendment
### Arrest Without Probable Cause
### (Plaintiff Williams against Williams Defendant Officers)

87.     Each paragraph of this Complaint is incorporated as if restated fully herein.

88.     Count I is alleged against the Williams Defendant Officers.

89.     The actions by Williams Defendants Officers in falsely detaining, arresting, and imprisoning Plaintiff Williams without probable cause violated Plaintiff Williams' clearly-established Fourth Amendment rights to be free from unreasonable search and seizure.

16

90.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

91.     The actions of the Williams Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights leading to loss of liberty, pain, suffering, mental distress, anguish, humiliation, degradation, and medical injury.

**COUNT II – 42 U.S.C. § 1983**
**Violation of the Fourth and Fourteenth Amendment**
**Unreasonable Seizure Pursuant to Legal Process**
**(Plaintiff Williams against Williams Defendant Officers)**

92.     Each paragraph of this Complaint is incorporated as if restated fully herein.

93.     Count II is alleged against the Williams Defendant Officers.

94.     The actions by the Williams Defendant Officers in falsely arresting and imprisoning Plaintiff Williams for nearly 11 months pursuant to legal process—including a probable cause hearing and grand jury indictment—were without probable cause. This violated Plaintiff Williams' Fourth Amendment rights to be free from unreasonable search and seizure.

95.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

96.     Plaintiff waited until the criminal charges on which Mr. Williams were held were terminated in his favor before bringing this civil action. The prosecution moved to dismiss charges before trial because it determined that it lacked evidence sufficient to prosecute the case.

97.     The actions of the Williams Defendant Officers were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment right to be free from unreasonable

17

search and seizure pursuant to legal process. Their actions were the direct and proximate cause of Plaintiff's loss of liberty for nearly 11 months, as well as pain, suffering, mental distress, anguish, degradation, humiliation, loss of liberty, and medical injury.

**COUNT III – 42 U.S.C. § 1983**
**Conspiracy to Deprive Plaintiff of His Constitutional Rights**
**(Plaintiff Williams against Williams Defendant Officers)**

98.     Each paragraph of this Complaint is incorporated as if restated fully herein.

99.     Count III is alleged against the Williams Defendant Officers.

100.     Each of the Williams Defendants Officers, acting in concert with one another as well as other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

101.     Each of the Williams Defendant Officers took concrete steps to enter into an agreement to unlawfully arrest and charge Plaintiff Williams, knowing they lacked probable cause to do so, and for the purpose of violating Plaintiff's Fourth and Fourteenth Amendment rights.

102.     In furtherance of this conspiracy, each of the Defendants committed specific overt acts, misusing their police powers for the purpose of violating Plaintiff's rights. They accomplished this goal by effecting the Plaintiff's arrest without probable cause and filing wrongful charges based on the false arrest, which resulted in Plaintiff's indictment and unlawful imprisonment.

103.     Each individual Defendant is therefore liable for the violation of Plaintiff's rights by any other individual Defendant.

104.     As a direct and proximate result of the William Defendant Officers' conspiracy, Plaintiff suffered loss of liberty for nearly 11 months, as well as pain, suffering, mental distress, anguish, degradation, humiliation, loss of liberty, and medical injury.

### COUNT IV – 42 U.S.C. § 1983
### Failure to Intervene
### (Plaintiff Williams against Williams Defendant Officers)

105.     Each paragraph of this Complaint is incorporated as if restated fully herein.

106.     Count IV is alleged against the Williams Defendant Officers.

107.     In the manner described above, during the constitutional violations described herein, one or more of the Williams Defendant Officers stood by without intervening to prevent the violation of Plaintiff Williams' constitutional rights, even though they had the duty and reasonable opportunity to do so.

108.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to the truth and Mr. Williams' constitutional rights.

109.     As a result of Defendants' misconduct described in this count, Mr. Williams suffered severe injuries, including the extended loss of his liberty, physical harm, emotional distress, and mental humiliation and anguish.

### COUNT V – State Law Claim
### Malicious Prosecution
### (Plaintiff Williams against Williams Defendant Officers)

110.     Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

111.     Count V is alleged against the Williams Defendant Officers.

112.     In the manner described more fully above, the Williams Defendants Officers commenced or continued criminal charges against Mr. Williams without probable cause.

113.     Among other acts and omissions, Williams Defendant Officers ignored exculpatory evidence that exonerated Mr. Williams. They misled the Court and prosecution with respect to the evidence, including video evidence and Mr. Williams' statements under interrogation. They failed to take basic steps to investigate the crime and failed to pursue other obvious lines of inquiry. Defendants thus caused the proceedings against Michael Williams to be initiated wrongfully and maliciously.

114.     In doing so, the Williams Defendant Officers caused Plaintiff to wrongfully be subjected to judicial proceedings without probable cause.

115.     These judicial proceedings were instituted and continued maliciously, resulting in injury to Plaintiff.

116.     In July 2021, Plaintiff's criminal prosecution was terminated in his favor upon the prosecution's motion to dismiss charges before any trial, without any conviction, based on its determination that the evidence did not support charges against Plaintiff.

117.     The Williams Defendant Officers' actions were willful and wanton, taken under color of law and within the scope of their employment.

118.     As a direct and proximate result of the Williams Defendant officers' misconduct described in this Count, Plaintiff suffered loss of liberty for nearly 11 months, as well as pain, suffering, mental distress, anguish, degradation, humiliation, loss of liberty, and medical injury.

## COUNT VI – State Law Claim
## Civil Conspiracy
## (Plaintiff Williams against Williams Defendant Officers)

119.     Each paragraph of this Complaint is incorporated as if restated fully herein.

120.     Count VI is alleged against the Williams Defendant Officers.

121.    The individual Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

122.    Each of the Williams Defendant Officers took concrete steps to enter into an agreement to unlawfully use force on, detain, and arrest the Plaintiff Williams, knowing they lacked probable cause to do so and for the purpose of violating Plaintiff Williams' rights.

123.    The Williams Defendant Officers committed unlawful overt acts and were otherwise willful participants in joint activity in furtherance of this conspiracy.

124.    The Williams Defendant Officers acted with malice, willfulness, and reckless indifference to the rights of others.

125.    Each Williams Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant.

126.    As a direct and proximate result of the Defendants' conspiracy, Plaintiffs suffered damages, including severe emotional distress and anguish, as a proximate result of the individual Defendants' misconduct and conspiracy to engage in misconduct.

**COUNT VII – State Law Claim**
**Respondeat Superior**
**(Plaintiff Williams against City of Chicago)**

127.    Each paragraph of this Complaint is incorporated as if restated fully herein.

128.    Count VII is alleged against the City of Chicago.

129.    In committing the acts alleged in this Complaint, each of the individual Defendant Officers were members of, and agents of, the CPD, acting at all relevant times within the scope of their employment.

130.    Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

### COUNT VIII – Indemnification
### (Plaintiff Williams against City of Chicago)

131.    Each paragraph of this Complaint is incorporated as if restated fully herein.

132.    Count VIII is alleged against the City of Chicago.

133.    In Illinois, pursuant to 745 ILCS 10/9-102, public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

134.    Each of the individual Williams Defendant Officers acted within the scope of their employment in committing the misconduct described herein. Therefore, Defendant City of Chicago is liable as their employer for any resulting damages or award of attorney's fees.

### COUNT IX – 42 U.S.C. § 1983
### *Monell* Liability for Damages - Violation of the Fourth and Fourteenth Amendments
### (Plaintiff Williams against Defendant City of Chicago)

135.    Each paragraph of the Complaint is restated as if fully incorporated herein.

136.    Count IX is alleged against Defendant City of Chicago.

137.    The actions of the Williams Defendant Officers were undertaken pursuant to the policies and practices of the CPD, described above and below, which included (1) failing to supervise, train, CPD officers with respect to the proper use of ShotSpotter in criminal investigations; (2) failure to supervise, train, or provide proper guidance or policy with respect to the use of ShotSpotter investigative lead summaries in the course of a criminal investigation; (3) failure to supervise, train, or provide proper guidance or policy with respect to the accuracy, precision, or reliability of the location information provided by ShotSpotter; and (4) enacting and

maintaining policies and practices directing CPD officers to regard ShotSpotter alerts as providing the "precise location" of a gunshot.

138.    These policies and practices were adopted, encouraged, and maintained by the City and ratified by decisionmakers with final policymaking authority.

139.    The City maintained and implemented these policies, practices, decisions, and failures of training and supervision with deliberate indifference. The City's final policy makers were subjectively aware knew that failing to train and supervise its officers about ShotSpotter would result in them misusing the technology to the detriment of those suspected of crimes, but they allowed officers to use ShotSpotter technology without proper training and supervision anyway.

140.    As a result of the City's policies, practices, decisions, and failures to train and supervise, the Williams Defendant Officers misused ShotSpotter evidence to initiate criminal proceedings against Mr. Williams despite the fact that it did not show his guilt.

141.    The City's failure to train the Williams Defendant Officers, as well as its policies, practices, and decisions, were a direct and proximate cause (*i.e.* a moving force) of the unconstitutional arrest, prosecution, and detention of Mr. Williams on false charges of First Degree Murder.

142.    As a direct and proximate result of the City's policies, practices, and failure to train, Plaintiff Williams suffered damages, suffered loss of liberty for nearly 11 months, as well as pain, suffering, mental distress, anguish, degradation, humiliation, loss of liberty, and medical injury.

## REQUEST FOR RELIEF

Wherefore, Plaintiff requests that this Court enter judgement against Defendants and award Plaintiff compensatory damages, punitive damages, attorneys fees and costs and any other relief the Court deems just and proper.

### Jury Demand

Plaintiff demands a jury trial.


Dated: March 15, 2024                    Respectfully submitted,

/s/Jonathan Manes
Jonathan Manes
Alexa Van Brunt
Sarah Blatt-Herold
Roderick & Solange MacArthur Justice Center
160 E. Grand Ave., 6th Floor
Chicago, IL 60611
(312) 503-0012 (tel)
(312) 503-0891 (fax)
jonathan.manes@macarthurjustice.org
alexa.vanbrunt@macarthurjustice.org

Elizabeth Mazur
Hughes Socol Piers Resnick & Dym, Ltd
70 W. Madison, Suite 4000
Chicago, Illinois 60603
(312) 580-0100
emazur@hsplegal.com

Daniel Massoglia
Joseph DiCola
Emma Melton
First Defense Legal Aid
601 S. California Ave.
Chicago, IL 60612
(708) 797-3066
daniel@first-defense.org
joseph@first-defense.org
emma@first-defense.org

Megha Ram
Roderick & Solange MacArthur Justice Center
501 H Street NE, Suite 275
Washington, DC 20002
(202) 869-3439 (tel)
(202) 869-3435 (fax)
megha.ram@macarthurjustice.org

**Certificate of Service**

I, Jonathan Manes, an attorney hereby certify that I served a copy of this amended pleading on all counsel of record on March 15, 2024, by operation of the Court's CM/ECF system.

/s/Jonathan Manes
Jonathan Manes