**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL WILLIAMS, et. al. | ) | |
| | ) | Case No. 24-cv-1396 |
| Plaintiff, | ) | (previously docketed as 22-cv-3773) |
| | ) | |
| vs. | ) | |
| | ) | Honorable Georgia N. Alexakis |
| CITY OF CHICAGO, et al., | ) | Magistrate Judge Young B. Kim |
| | ) | |
| Defendants. | ) | |

**DEFENDANT OFFICERS'
LOCAL RULE 56.1(a)(3) STATEMENT OF UNDISPUTED FACTS**

Defendants Nicholas Evangelides, Dale Potter Jr., Scott Reiff, Brian Roney, and Marc Lapadula ("Defendant Officers"), by and through their undersigned counsel, and pursuant to Local Rule 56.1(a)(3), hereby submit the following statements of undisputed material facts in support of their Motion for Summary Judgment and accompanying Memorandum of Law.[1]

**Jurisdiction and Venue**

1. Jurisdiction by this Court and venue is proper because Plaintiff brings federal claims pursuant to 42 U.S.C. § 1983 and the events giving rise to the alleged claims occurred within the judicial district of the Northern District of Illinois. (Answer to Plaintiff's Third Amended Complaint ("Ans. To TAC"), Dkt. # 45, ¶¶3-4).

**Parties and Claims**

2. Michael Williams ("Plaintiff") brings this lawsuit alleging constitutional and state law violations in connection with homicide investigation that led to his prosecution and approximately 1 year detention. (TAC ¶ 1 et seq.). Defendant Officers are being sued in their individual capacities for events

---

[1] The facts set forth herein are being submitted pursuant to Local Rule 56.1 and are not admitted for any purpose other than to facilitate an analysis under Fed. R. Civ. P. 56, which requires facts to be considered in a light most favorable to the nonmovant.

that allegedly occurred while they were acting under color of law as members of the Chicago Police Department. (TAC ¶8). At the time of arrest Plaintiff was 64 years old, 5 foot 6 inches tall, and 210 lbs. (Exhibit ("Ex.") 1, Michael Williams Arrest Report Dated August 28, 2020).

3. Plaintiff brings claims in separate counts styled: (I) Violation of the Fourth and Fourteenth Amendment Arrest Without Probable Cause; (II) Violation of the Fourth and Fourteenth Amendment Unreasonable Seizure Pursuant to Legal Process; (III) Conspiracy to Deprive Plaintiff of His Constitutional Rights; (IV) Failure to Intervene; (V) State Law Claim Malicious Prosecution; (VI) State Law Claim Civil Conspiracy; (VII) State Law Claim Respondeat Superior; (VIII) Indemnification; (IX) *Monell* Liability for Damages - Violation of the Fourth and Fourteenth Amendments. (TAC ¶¶ 87-142).

4. Defendant Officers were assigned to the Area One Homicide Team during the underlying investigation; in summary their work in the investigation was:

a. Detective ("Det.") Nicholas Evangelides, was the lead detective in the Safarian Herring homicide investigation; it was his decision to take Plaintiff into custody. (Ex. 2, Deposition of Det. Nicholas Evangelides taken September 15, 2023 at 17:20-25, 256:20-23).

b. Det. Dale Potter Jr. was present for Plaintiff's witness statement to police and then custodial statement, he also assisted the investigation by obtaining search warrants and reviewing evidence. (Ex. 3, Deposition of Det. Dale Potter taken September 20, 2023 at 60:8-61:23; 64:7-11; 102:3-103:19; 266:19-267:4).

c. Det. Scott Reiff was present for Plaintiff's statements to police and Jackie Anderson's statement (Plaintiff's wife). (Ex. 4, Deposition of Scott Reiff taken September 27, 2023 at 26:7-12; 169:12-23; 178:1-14; 218:7-24). His primary role was to take notes and he only asked a few clarifying questions. (Ex. 4, Reiff Dep. at 178:7-20, 292:8-25, 218:7-15-24, 225:8-12; Ex. 43,

Plaintiff Electronically Recorded Interview ("ERI") at 19:29:10-19:30:04).[2] Det. Evangelides discussed the decision to arrest with him and Det. Potter; Reiff does not remember the substance of that conversation. (Ex. 4, Reiff Dep. at 189:18-189:13, 293:5-9). His involvement in the case was limited to August 28 and August 29, 2020. (Ex. 4, Reiff Dep. at 288:13-289:6).

d. Det. Marc Lapadula, retired, spoke to the Assistant Medical Examiner over the phone to gather information regarding range of fire for the victim's gunshot wound. (Ex. 5, Lapadula Dep. at 18:14-19:14, 13:22-14:19, 43:20-25, 58:5-14). He memorialized that conversation in a GPR and verbally summarized the conversation to Det. Evangelides; he did not interact with Plaintiff. (Ex. 5, Lapadula Dep. at 13:22-14:19, 59:24-60:17; Group Ex. 15, General Progress Reports ("GPRs") at City 2497; Ex. 21, Case Supplementary Report ("Sup. Report") #13909192 dated December 2, 2020 at City 2423). The phone call was his only involvement in the case. (Ex. 5, Lapadula Dep. at 18:14-19:14, 13:22-14:19, 43:20-25, 58:5-14). Det. Lapadula was not involved in the decision to arrest or detain Plaintiff and did not interact with Plaintiff. (Ex. 5, Dep Lapadula, 13:22-14:19, 59:24-60:17).

e. Sergeant Brian Rony, retired, was Defendants Evangelides, Potter, Reiff and Lapadula's supervising sergeant. (Ex. 6, Deposition of Brian Roney taken September 21, 2023 at 10:21-11:2). In June of 2020, Sgt. Roney assisted Det. Evangelides in trying to find video footage from the incident by searching POD video and cameras from local businesses. (Ex. 6, Roney Dep. at 84:17-85:14, 95:9-96:15, 99:3-12, 208:17-210:2). Sgt. Roney was not working when Plaintiff was arrested or when charges were approved; he was on furlough leave. (Ex. 6, Roney Dep. at 19:15-20:24). Attendance records from the Chicago Police Department confirm that

---

[2] In the ERI video, Plaintiff can be seen seated on the bench, then Det. Evangelides is to the right and Det. Potter to the left. Det. Reiff is not visible on camera.

Sgt. Roney was not working on August 28th, 29th or 30th. (Ex. 7, Attendance and Assignment ("A&A") Sheets at NK DEFS 183, 200, 217; Dep of Roney, 20:3-24.).[3] Sgt. Roney did not have any role in the decision-making process to arrest or seek charges in Plaintiff's case. (Ex. 6, Roney Dep. at 271:8-12, 284:9-22).

**The Initial Police Investigation Into The Murder of Safarian Herring on May 31, 2020**

5.  On May 31, 2020, at approximately 11:55 PM, a John Doe was dropped off, unconscious, at St. Bernard Hospital. (Ex. 8, Sup. Report Dated June 4, 2020 at City 2454). He had a single gunshot wound which entered the left side of his head and lodged inside of his brain. (Ex. 9, Safarian Herring Medical Examiner Photo; Group Ex. 15, GPRs at City 2454). St. Bernard Hospital transferred him to the University of Chicago Hospital for care on June 1, 2020. (Ex. 15, GPRs at City 2454).

6.  St. Bernard Hospital personnel called Chicago police when the body was dropped off; stating that a car dropped off "John Doe" with a gunshot wound and fled. (Ex. 10, Original Incident Report Date June 1, 2020 at City 885-886; Ex. 11, Office of Emergency Management and Communication "OEMC" Event Query Report; Ex. 12, Event History Records at 1072-1073). The victim's medical records from St. Bernard's stated the body was dropped off by an "unknown male." (Ex. 13, Safarian Herring St Bernard Hospital Records at City 1015-1016). Det. Kociolek, a first watch detective working midnights, was assigned to the aggravated battery investigation on June 1, 2020. (Ex. 14, Deposition of Det. Michael Kociolek taken September 12, 2023 at 30:11-13, 33:19-34:5; Ex. 15, GPRs at City 2454).

7.  This was a night of civil unrest in the City marked by chaos, protesting, mass looting and property destruction. (Ex. 2, Evangelides Dep. at 63:4-12; Ex. 16, Deposition of Plaintiff Michael Williams taken September 14, 2023 at 82:22-83).

---

[3] For multi-page exhibits the citation includes the bates stamps to the specific page for the content referenced.

8.   Det. Kociolek first went to the University of Chicago to observe the victim, note his injuries, clothing and tattoos, and made a plan to visit St. Bernard Hospital to receive a copy of the video surveillance. The victim arrived at the hospital with no wallet or identification. (Ex. 4, Kociolek Dep. at 125:18-131:8; Group Ex. 15, GPRs at City 2458-59). Det. Kociolek was informed the victim likely would not survive. (Ex. 14, Kociolek Dep. at 122:2-20).

9.   Outside of the call from the hospital, there were no 911 calls to report the shooting. (Ex. 16, Plaintiff's Dep. at 132:12-134:20; Ex. 17, 911 audio from St. Bernard Hospital, 00:01-3:27).

10. At St. Bernard Hospital, Det. Kociolek spoke to a hospital security officers Malik Adams and Lawrence Kemp, who showed him security footage from the emergency room bay. (Ex. 14, Kociolek Dep. at 135:18-143:12; Ex. 15, GPRs at City 2458). Det. Kociolek learned from the St. Bernard security guards that they had no details of the shooting, no name of the victim, and no information about the identity of the driver who dropped the victim off. (Ex. 14, Kociolek Dep. at 138:22-140:11; Ex. 15, GPRs at City 2458; Ex. 18, Deposition of Malik Adams taken on February 13, 2024 at 82:4-1; Ex. 19, St. Bernard Hospital Security Department Report No. 20-0789; Ex. 20, Deposition of Lawerence Kemp taken on February 13, 2024 at 39:15-40:5, 61:19-62:21).[4] Det. Kociolek reviewed the security video, made notes, and requested a copy of the video; the video was not immediately available but would be ready later. (Ex. 8, Sup. Report at City 2454; Ex. 14, Kociolek Dep. at 141:2-147:1).

11. An evidence technician took the victim's fingerprints for identification purposes and soon after the victim was identified as Safarian Herring ("Herring" or "victim"). (Ex. 8, Sup. Report at City

---

[4]The St. Bernard Hospital Security Department Report, Ex. 19 was received in fact discovery pursuant to a subpoena confirming that St. Bernard security staff did not document any identifying information from Plaintiff. The report states that ". . . John Doe arrived by an unknown individual who left shortly after." Kemp and Adams testified at their depositions that had they been provided contact information it would have been in the report. (Ex. 18, Adams Dep at 82:4-11; Ex. 19, St. Bernard Hospital Security Department Report No. 20-0789; Ex. 20, Kemp Dep. at 39:15-40:5, 61:19-62:21).

2454). Shortly thereafter, on June 2, 2020, Herring died without ever regaining consciousness. (Ex. 21, Sup. Report at City 2418). He weighed 156 pounds. The Cook County Medical Examiner ruled the death a homicide. (Ex. 22, Herring's Autopsy Report).

12. Det. Kociolek spoke to the victim's mother, Samona Nicholson, and learned information relating to the possible whereabouts of the victim the night of the shooting. (Ex. 14, Kociolek Dep. at 198:20-200:5, 200:14-201:16, 203:12-3, 205:25-9; Ex. 21, Sup. Report at City 2454). Det. Kociolek followed-up on the information provided by Nicholson. (Ex. 14, Kociolek Dep. at 206:14-207:18). Det. Kociolek had no further role in the investigation. (Ex. 14, Kociolek Dep. at 215:18-216:16, 244:4-14; Ex. 21, Sup. Report at City 2418).

13. Sgt. Roney assigned Det. Evangelides the shooting on June 1, 2020. (Ex. 2, Evangelides Dep. at 67:4-25 70:2-7; Ex. 6, Roney Dep. at 24:11-25:13). Det. Evangelides was the lead detective, other homicide detectives pitched in where needed. (Ex. 2, Evangelides Dep. at 143:3-21).

14. On June 1, 2020, Det. Potter obtained a search warrant for Herring's Facebook account. (Ex. 21, Sup. Report at City 2417; Ex. 3, Potter Dep. at 100:21-1002:7).

15. Det. Potter received the requested information from Facebook, reviewed the content and found nothing of significant evidentiary value. (Ex. 3, Potter Dep. at 102:3-103:19; Ex. 21, Sup. Report at City 2417).

16. Also on June 1, 2020, Det. Evangelides also spoke to Samona Nicholson, the mother of Herring. (Ex. 2, Evangelides Dep. at 80:14-25; Ex. 21, Sup. Report at City 2417). Nicholson provided him with Herring's phone number. (Ex. 2, Evangelides Dep. at 81:24-82:5; Ex. 21, Sup. Report at City 2417).

17. Nicholson told Det. Evangelides that she last spoke to her son on May 31, 2020, at 2:00 PM. (Ex. 2, Evangelides Dep. at 82:6-9; Ex. 21, Sup. Report at City 2417). Nicholson told Det. Evangelides

that she had received a call from an unknown number, 773-XXX-4303, on May 31, 2020 at 11:25 PM, but did not answer. (Ex. 2, Evangelides Dep. at 83:1-4; Ex. 21, Sup. Report at City 2417).[5] Nicholson had called 773-XXX-4303 the next day, after she'd learned of her son's death, and spoke to an unknown black male who explained that the previous evening while he was outside the AutoZone near 76th and Stony Island Ave. and he let a guy use his phone to try to find a ride home. (Ex. 21, Sup. Report at City 2417). The unknown male refused to provide his identity, explained he could not provide any additional information, and expressed an unwillingness to cooperate further. (Ex. 21, Sup. Report at City 2417).

18. On June 2, 2020, Det. Evangelides spoke to Kendra Rufus, friend of the Herring family, who explained that she also called the 773-XXX-4303 phone number that had called Nicholson, and spoke to the unknown male black who informed Rufus that he had allowed a guy to use his phone to call someone to pick him up and a short time later, the guy got into a silver vehicle at the AutoZone and left. (Ex. 2, Evangelides Dep. at 85:21-86:16; Ex. 21, Sup. Report at 2417).

19. On June 6, 2020, Det. Potter drafted a search warrant for the T-Mobile phone number 773-XXX-4303, that had called Herring's mother. (Ex. 21, Sup. Report at 2424). The call records for the phone number showed the phone had been used to call various friends and family of Herring. (Ex. 3, Potter Dep. at 109:13-139:22). The phone number was registered to a woman named Marche Cadenhead who was associated with a man named Ricky Patterson. (Ex. 3, Potter Dep. at 109:13-140:23; Ex 8, GPRs at City 2486). Efforts to contact Patterson were met with negative results.[6] (Ex. 2, Evangelides Dep. at 88:19-92:16, 108:14-109:11).

---

[5] In the investigation this number is revealed to be connected to an individual named Ricky Patterson as addressed *infra*. At his deposition he requested that this number be treated as confidential and all parties agreed and thus the full number is redacted here. (Ex. 24, Patterson deposition, 31:1-16).

[6] In fact discovery, the parties deposed Patterson who stated that detectives may have tried to contact him during the investigation, but he did not answer any unknown numbers and his voicemail was full so they would

20. Det. Evangelides reviewed the surveillance footage from St. Bernard Hospital's ambulance bay which showed the following:

    a.   A silver Toyota Rav-4 pulls up to the ambulance bay and the driver, a male black in a blue t-shirt, exits the vehicle. (Ex. 25, St. Bernard Ambulance Bay Video 1 at 10:48-13:23).

    b.   There is visible damage to the front right headlight of the Rav-4. (Ex. 21, Sup. Report at 2419; Ex. 25, Ambulance Bay Video 1 at 10:48-11:02).

    c.   Two paramedics pull Herring's unconscious body out of the front passenger seat of the vehicle, put him on a gurney, and take him into the hospital; no one else exits the vehicle. (Ex. 25, Ambulance Bay Video 1 at 13:23-14:58).

    d.   Numerous items can be seen through the rear windows of the vehicle, stacked to the top of the Rav-4. (Ex. 3, Potter Dep. at 273:23-274:23; Ex. 25, Ambulance Bay Video 1 at 13:23-14:59).

    e.   After parking the vehicle, the driver is seen entering the hospital. (Ex. 25, Ambulance Bay Video 1 at 13:23-16:03; Ex. 26, St. Bernard Ambulance Bay Video 2 at 00:00-00:21).

---

not have been able to leave a voicemail. (Ex. 24, Ricky Patterson Deposition taken on February 26, 2024 at 84:3-85:13). Patterson testified Marche Cadenhead is his fiancé and the phone belongs to him. (Ex. 24, Patterson Dep. at 31:1-8). Patterson testified that on the night of the homicide, he was standing in front of the AutoZone, observing the looting when a young man, believed to be Herring, approached him and asked for a ride home, and in exchange for the ride, showed Patterson the contents of his backpack which appeared to be various car accessories from the AutoZone. (Ex. 24, Patterson deposition at 35:1-49:22). Patterson declined, but allowed Herring to use his phone because he was looking for a ride home. (Ex. 24, Patterson deposition at 35:1-20). Patterson testified Herring appeared intoxicated. (Ex. 24, Patterson Dep. at 118:16-120:4). Patterson testified that he observed a gray SUV pull into the AutoZone parking lot and park. (Ex. 24, Patterson Dep. at 57:16-60:10, 128:24-25). The driver, an older bald black male, entered the AutoZone, which was being looted (the store was closed) and exited moments later empty-handed. (Ex. 24, Patterson Dep. at 59:16-61:11). When the man exited the store, the boy who had used his phone approached him, opened his backpack and showed him what was inside and said something Patterson could not hear. (Ex. 24, Patterson Dep. at 61:12-66:17). The driver seemed to agree after peering into the bag, and then both individuals got into the SUV and drove off. (Ex. 24, Patterson Dep. at 67:21-69:10). Patterson had not seen anyone else inside the SUV. (Ex. 24, Patterson Dep. at 66 :18-23).

21. Surveillance video from inside St. Bernard Hospital showed the driver of the Rav-4 in the blue T-shirt enter the lobby, briefly interact with security, and then exit the hospital after five minutes and drive away. (Ex. 3, Potter Dep. at 172:5-12; Ex. 27, St. Bernard Main Entrance Video at 00:31-5:46).

22. On June 4, 2020, Det. Evangelides received a ShotSpotter Investigative Lead Summary report. (Ex. 2, Evangelides Dep. at 149:4-13; Ex. 21, Sup. Report at City 2418; Ex. 28, ShotSpotter Alert Report).The ShotSpotter report documented that a single gunshot was detected near the intersection of Stony Island Ave. and 63rd Street at approximately 11:46 PM; Det. Evangelides was able to listen to audio of the shot. (Ex. 2, Evangelides Dep. at 153:18-20, 182:20-186:11, 211:12-15; Ex. 21, Sup. Report at City 2418; Ex. 28, ShotSpotter Alert Report).

23. ShotSpotter is an acoustic detection system used to identify potential gunshot acoustic events and related information and then relay that information to police. (Ex. 29, Deposition of Det. Scott Brownly taken November 20, 2023 at 16:1-15). The detectives in this case are familiar with ShotSpotter and understand that it reflects a general location and other limited information about an acoustic event, including different types of weapons used in approximate number of rounds; it contains no other information such as the identity of who shot the gun. (Ex. 2, Evangelides Dep. at 153:18-20, 330:13-331:10; Ex. 3, Potter Dep. at 74:18-76:25; Ex. 30, Deposition of Det. Carol Maresso taken January 23, 2024 at 32:7-22). Det. Evangelides testified at his deposition that the ShotSpotter report confirmed the location where the shot was fired, not whether the gunshot originated within Plaintiff's car or from outside the car. (Ex. 2, Evangelides Dep. at 330:13-331:10). The detectives did not use the ShotSpotter alert to determine who fired the gunshot. (Ex. 2, Evangelides Dep. at 330:13-331:10).

24. On June 4, 2020 Sgt. Roney searched the Accurint database for all registered Toyota Rav-4 vehicles in the vicinity of the hospital, and he identified a Toyota Rav-4 ("Rav-4") bearing license plate number AD34633 registered to Plaintiff. (Ex. 2, Evangelides Dep. at 187:8-25; Ex. 21, Sup. Report at

City 2418; Ex. 31, Accurint Search Results). Reviewing Secretary of State information detectives saw that Plaintiff's driver's license photo appeared to match the driver of the Rav-4 from the St. Bernard surveillance video. (Ex. 2, Evangelides Dep. at 248:9-249:25; Ex. 21, Sup. Report at City 2419). Detectives obtained Plaintiff's criminal history report, which indicated Plaintiff had prior convictions for aggravated discharge of a firearm, robbery and attempted murder. (Ex. 62, Plaintiff's Criminal History Report at City 1114-1128).

25. Detectives tracked the Rav-4 vehicle using a variety of tools including POD (Police Observation Device which are CPD owned surveillance cameras in public areas) video footage, red-light camera footage, and license plate readers. (Ex. 2, Evangelides Dep. at 187:8-22; Ex. 6, Roney Dep. at 84:17-87:3, 92:8-96:15, 102:23-104:12; Ex. 15, GPRs at 2467, 2468, 2474, 2479; Ex. 21, Sup. Report at City 2418-2419; Ex. 30, Maresso Dep. at 58:12-60:25, 61:4-13, 61:18-25, 66:2-17; Ex. 32, License Plate Reader Report at City 1051-1059).

26. Detectives were able to track the Rav-4 to 63rd St. and Stoney Island Ave. where they located POD video showing the following on May 31, 2020 at approximately 11:46 PM:

  a. A black sedan driving northbound on Stony Island approaches the red light and pauses in the left turn lane. (Ex. 21, Sup. Report at City 2419; Ex. 33, POD Video 7078 at 11:46:27-11:46:32).

  b. Plaintiff's silver Rav-4 appears to the right of the black sedan, also travelling northbound on Stony Island, and slows down as it approaches the red light at 63rd St. (Ex. 21, Sup. Report at City 2419; Ex. 33, POD Video 7078 at 11:46:27-11:46:32).

  c. The passenger side windows of the Rav-4 are rolled up. (Ex. 21, Sup. Report at City 2419; Ex. 33, POD Video 7078 at 11:46:16-11:46:36).

d. Then both the black sedan and the Rav-4 speed up and run the red light and drive off screen with the black sedan turning left on 63rd and the Rav-4 continuing straight on Stony Island. (Ex. 21, Sup. Report at City 2419; Ex. 33, POD Video 7078 at 11:46:16-11:46:36).

e. No shooting is visible on the video. Two minutes later, the Rav-4 returns to the intersection, now going southbound on Stoney Island, where it makes a right hand turn onto 63rd St and then proceeds to St. Bernard Hospital. (Ex. 6, Roney Dep at 228:7-24, 231:3-24; Ex. 21, Sup. Report at City 2419; Ex. 30, Maresso Dep. at 43:23, 141:11-1, 143:24-144:8; Ex. 33, POD Video 7078 at 11:46:16-11:46:36).

27. When Detectives reviewed the POD video, they noted that light reflections on the passenger side windows of the black sedan as it moved through the intersection indicated the passenger windows were rolled up. Detectives also did not observe any gun extension or muzzle-flash coming from the black sedan. (Ex. 2, Evangelides Dep. at 198:6-205:4, 326:21-25, 235:4-236:21; Ex. 3, Potter Dep. at 201:1-20, 211:3-215:14; Ex. 6, Roney Dep at 203:1-208:16, 224:15-234:17; Ex. 21, Sup. Report at City 2419; Ex. 33, POD Video).

28. Detectives, believing the black sedan may contain witnesses to the shooting, made attempts to identify the black sedan by reviewing POD camera footage, but were never able to obtain footage revealing a license plate number. Also, there were no identifying or distinctive marks on the black sedan to help identify the vehicle. (Ex. 2, Evangelides Dep. at 209:19-211:5, 234:20-235:1; 236:5-7; Ex. 6, Roney Dep at 201:14- 203:7, 209:11-210:2).

**Police Locate Plaintiff's Car**

11

29. On June 6, 2020 officers assisting the detectives went to locate the Rav-4. (Ex. 2, Evangelides Dep. at 245:9-246:5; Ex. 34, Deposition of Sergeant Juan Perez taken November 14, 2023 at 28:2-29:23, 44:1-45:15, 46:7-10). The Rav-4 was found on 7800 Block of South Euclid parked on the street. (Ex. 34, Perez Dep. at 50:20-24, 53:13-16; Ex. 21, Sup. Report at 2420). The car was towed and impounded for processing with notice sent to Plaintiff on June 15, 2020, informing him that his car had been towed for processing in relation to a criminal investigation by the Chicago Police Department. After his car was towed, Plaintiff never retrieved the car. (Michael Williams Deposition Transcript, 51:22-24). Plaintiff never contacted the police department to report the shooting after he received the notice that his car was towed for a police investigation on June 6, 2020. (Ex. 16, Plaintiff's Dep. at 239:19-241:19; Ex. 21, Sup. Report at City 2420; Ex. 2, Evangelides Dep. at 243:7-21; Ex. 35, Impound Vehicle Notice at Williams 3192-3193).

30. Det. Potter obtained a search warrant for the vehicle and evidence technicians processed the vehicle. (Ex. 2, Evangelides Dep. at 243:7-245:12; Ex. 21, Sup. Report at City 2420; Ex. 36, Crime Sence Processing Report, CCSAO 214-215).

31. The vehicle had exterior damage to the front passenger side, consistent with the damaged captured by Saint Bernard Hospital video surveillance. (Ex. 25, Ambulance Bay Video 1 at 10:48-11:02; Group Ex. 37, Photos of Plaintiff's Car at City 1153). All of the windows and glass in the vehicle were intact, nothing was shattered. (Group Ex. 37, Photos of Plaintiff's Car at City 1149, CITY 1153, CITY 1164; Ex. 41, Vehicle Inventory Report). Even though the vehicle appeared to have been cleaned, there were blood stains throughout the front passenger area of the car. (Ex. 2, Evangelides Dep. at 243:22-244:13; Ex. 21, Sup. Report at City 2420; Ex. 29, Photos of Plaintiff's Car at City 1159). The vehicle was nearly empty. (Group Ex. 27, Photos of Plaintiff's Car).

32. A blood sample recovered from the front passenger side floor panel was sent to the Illinois State Police Crime Lab for testing. (Ex. 21, Sup. Report at City 2420; Ex. 38, ISP Report #1 at CCSAO 282-283; Ex. 39, ISP Report #2, CCSAO 375-378). A sample from the front passenger seat headrest was also sent for processing of gunshot residue. (Ex. 21, Sup. Report at 2420; Ex. 40, ISP Report #6 at CCSAO 145-148). Forensic analysis from the Illinois State Polices showed that the stains in Rav-4 were Safarian Herring's blood. (Ex. 21, Sup. Report at City 2439-2440; Ex. 32, ISP Report #2, CCSAO 375-378).

### Detectives Continue Gathering Information

33. On June 14, 2020 Sgt. Roney canvassed the area on foot looking for video cameras from private businesses and visited Daley's restaurant and retrieved video from the exterior cameras and spoke to the owner. (Ex. 6, Roney Dep at 114:15-115:23, 116:2-22; Ex. 15, GPRs at City 2482; Ex. 21, Sup. Report at City 2419). The Daley's restaurant footage showed the Rav-4 hit another vehicle at 63rd and Cottage Grove Ave. (Ex. 2, Evangelides Dep. at 282:3-283:16; Ex. 6, Roney Dep at 116:23-117:4; Ex. 21, Sup. Report at City 2419). The exterior damage noted on the Rav-4 was consistent with this car accident. (Ex. 25, Ambulance Bay Video 1 at 10:48-11:02; Ex. 37, Photos of Plaintiff's Car at City 1153). Technical glitches resulted in the loss of the video recording, but still photographs from the recording capturing the accident were preserved. (Ex. 2, Evangelides Dep. at 282:3-22; Ex. 6, Roney Dep at 117:8-120:10; Ex. 21, Sup. Report at 2419; Ex. 42, Daley Stills).

34. Plaintiff never called 911 or reported the car accident. (Ex. 2, Evangelides Dep. at 282:3-283:16; Ex. 43, Michael Williams ERI, 19:32:43-19:33:25).

35. On July 6, 2020, Det. Evangelides received video surveillance from the AutoZone located at 7600 S. Stony Island Ave. (Ex. 21, Sup. Report at City 2420). There was no external surveillance video from the AutoZone, but internal video reflected mass looting and chaos inside the store. (Ex 44,

AutoZone Interior Video ). A man whose appearance was consistent with Herring was observed inside the AutoZone. (Ex. 21, Sup. Report at City 2420-2421; Ex 44, AutoZone Interior Video at approx. 20:00).

36.   In July 2020 detectives spoke with people who were identified to have had contact with Herring the night of his death. (Ex. 2, Evangelides Dep. at. 177:12-182:10, 252:3-259:16; Ex. 21, Sup. Report at 2421). Detectives learned the following: that Herring was last seen in the area of East End and Cornell on the date of the incident, which was a site of looting and chaos. (Ex. 21, Sup. Report at 2421); Herring was looking for his girlfriend who he believed had his cell phone. (Ex. 2, Evangelides Dep. at 177:12-182:10; 252:3-259:16; Ex. 21, Sup. Report at 2418); Herring was seen carrying a backpack filled with alcohol; (Ex. 2, Evangelides Dep.at 253:15-254:8; Ex. 21, Sup. Report at 2421). Later testing revealed Herring's blood alcohol concentration was .226 g/100 mL. (Ex. 22, Safarian Herring Autopsy Report at CCME Subpoena Response 9; Ex. 45, Deposition of Dr. Reema Khan Deposition taken October 24, 2024 at 112:5-11).

**Police Locate Plaintiff and Interview him**

37.   On August 28, 2020, officers assisting detectives located Michael Williams to see if he would consent to an interview. (Ex. 2, Evangelides Dep. at. 260:7-262:9; Ex. 21, Sup. Report at 2421). At this time, detectives did not know who or how many people were present in the Rav-4 at the time of the shooting, if there were any possible explanations for Herring's injuries, including whether there was a fight or if the shooting was in self-defense or whether Herring had even shot himself. (Ex. 2, Evangelides Dep. at 260:7-265:18; Ex. 3, Potter Dep. at 324:15-334:17).

38.   On August 28, 2020, CPD police officers arrived at Michael Williams' house on the 7800 block of South Euclid Avenue. (Ex. 16, Plaintiff Dep. at 241:20-242:16; Ex. 21, Sup. Report at 2421). Plaintiff was informed that he was not under arrest and that detectives wanted to speak to him

regarding an investigation. Plaintiff voluntarily agreed to come to the police station for an interview. (Ex. 2, Evangelides Dep. at 244:9-245:12; Ex. 16, Plaintiff Dep. at 243:15-245:12; Ex. 26, Perez Dep. at 95:14-96:23, 107:10-21, 106:3-108:7, 111:8-15, 226:14-228:24).

39.   Plaintiff was brought into an office for his interview. (Ex. 16, Plaintiff Dep. at 247:2-6). Plaintiff was offered water and was not handcuffed. (Ex. 16, Plaintiff Dep. at 247:18-22).

40.   The interview, conducted by Det. Evangelides, began at approximately 6 PM. Det. Reiff primarily took notes during the interview, he testified he was not sure if he asked any questions, but if he did, it would not have been many. (Ex. 4, Reiff Dep. at 178:1-11, 292:4-25). Det. Potter was also present. During the interview, detectives did not use force, yell, or swear at Plaintiff. (Ex. 2, Evangelides Dep. at 262:5-9; Ex. 4, Reiff Dep. at dep 178:1- 20; Ex. 15, GPRs at City 2488, 2489; Ex. 16, Plaintiff Dep. at 248:1-7; Ex. 21, Sup. Report at 2421; Ex. 43, Williams ERI, generally).[7] During this interview, Plaintiff stated in summary:

> a. On the night of the shooting, he went with his wife Jacqueline to her mom's house for a short time till 7-9 PM, then left and drove around. (Ex. 2, Evangelides Dep. at 263:7-11; Ex. 4, Reiff Dep. at 182:13-19; Ex. 15, GPRs at City 2488).
>
> b. Plaintiff and Jackie saw a lot of looting and rioting in the neighborhood. They did not partake in the looting but they saw several bags of groceries on the street and put them in the car. They unloaded some of the bags at home. (Ex. 2, Evangelides Dep. at 263:9-18; Ex. 4, Reiff Dep. at 182:20-25; Ex. 15, GPRs at City 2488-89).

---

[7] In the Electronically Recorded Interview ("ERI") Det. Evangelides confirms statements made by Plaintiff in his pre-arrest witness statement.

c. Later Plaintiff went out to drive around again and to get cigarettes when he saw victim Herring near 76th and Stoney Island by an AutoZone. Herring asked him for a ride. Plaintiff didn't know the victim's name but knew him from the neighborhood. Plaintiff gave him the ride even though he did not work as a driver for any ride-share or taxi companies. (Ex. 2, Evangelides Dep. at 263:18-24; Ex. 4, Reiff Dep. at 183:1-6; Ex. 15, GPRs at City 2488-89; Ex. 21, Sup. Report at City 2422).

d. They started driving north on Stoney Island, Herring was sitting in the front passenger seat, with his window rolled up. Plaintiff's window was rolled down. They stopped at the red light at 63rd and Stoney Island. (Ex. 2, Evangelides Dep. at 263:24-264:3; Ex. 4, Reiff Dep. at 183:7-10; Ex. 15, GPRs at City 2488-89; Ex. 16, Plaintiff Dep. at 167:22-168:6; Ex. 21, Sup. Report at City 2419, City 2422; Ex. 33, POD Video 7078 at 11:46:16-11:46:36; Ex. 43, Williams ERI at 19:21:57-19:24:20).

e. No one else was in the car. (Ex. 2, Evangelides Dep. at 263:24; Ex. 15, GPRs at City 2488-89; Ex. 21, Sup. Report at City 2422).

f. Plaintiff said Herring did not have a gun. (Evangelides, 263:9-265:10; Ex. 15, GPRs at City 2488-89; Ex. 21, Sup. Report at City 2422). Plaintiff confirmed at his deposition that Herring did not have a gun. (Ex. 16, Plaintiff Dep, 126:21-22).

g. While stopped at the light, a beige car pulled up next to him at the intersection of 63rd and Stone Island. (Ex. 2, Evangelides Dep. at, 264:1-4; Ex. 16, Plaintiff Dep. at 118:13-120:6). The front seat passenger in the light-colored car pulled

up on the left of Plaintiff's car. He was a black male with his window rolled down. (Ex. 2, Evangelides Dep. at 264:5-6; Ex. 15, GPRs at City 2488-89; Ex. 21, Sup. Report at City 2422).

h. Plaintiff looked to the left, saw the male, looked back north and heard one gunshot. He ducked and then saw his passenger was bleeding. (Ex. 2, Evangelides Dep. at 274:1-9; Ex. 4, Reiff Dep. at 183:16-18; Ex. 15, GPRs at City 2489; Ex. 16, Plaintiff Dep. 130:13-142488-89; Ex. 21, Sup. Report at City 2422).

i. After the shot, the beige car then continued straight going northbound on Stony Island and Plaintiff also drove northbound on Stony Island. (Ex. 2, Evangelides Dep. at 274:1-10; Ex. 4, Reiff Dep. at 183:18-21; Ex. 15, GPRs at City 2489).

j. Plaintiff did a U-turn by the school and went back to 63rd street to turn westbound and head to St. Bernard hospital. (Ex. 2, Evangelides Dep. at 274:10-12; Ex. 15, GPRs at City 2489; Ex. 21, Sup. Report at City 2422).

k. Plaintiff denied being in a traffic crash. (Ex. 2, Evangelides Dep. at 274:12; Ex. 15, GPRs at City 2489; Ex. 21, Sup. Report at City 2422).

l. Plaintiff stated he brought the victim to St. Bernard Hospital and told the security guard his contact information and left. (Ex. 2, Evangelides Dep. at 274:13-16; Ex. 4, Reiff Dep. at 183:22-25; Ex. 15, GPRs at City 2489; Ex. 21, Sup. Report at City 2422).

m. Plaintiff admitted he never called 911, never spoke to the police, and did not perform CPR on the victim. (Ex. 2, Evangelides Dep. at 274:13-16; Ex. 4, Reiff

Dep. at 183:25-184:1; Ex. 15, GPRs at City 2489; Ex. 21, Sup. Report at City 2422).

n. Plaintiff also stated his wife Jacqueline cleaned the car out shortly after the shooting without his knowledge. (Ex. 2, Evangelides Dep. at 274:17-18; Ex. 4, Reiff Dep. at 182:13-184:5; Ex. 15, GPRs at City 2489; Ex. 21, Sup. Report at City 2422).

41. Detectives observed a number of inconsistencies between Plaintiff's statement and the objective evidence that indicated deception. (Ex. 2, Evangelides Dep. at 265:20-267:17; 272:23-274:23; Ex. 3, Potter dep. at 267:19-334:24; Ex. 4, Reiff Dep. at 189:18-190:20, 208:22-209:8; Ex. 21 Sup. Report at 2422). For example, the color of the car next to Plaintiff at the intersection on the shooting video did not match Plaintiff's statement, the black car that was there had its front passenger window up, the black car turned left after the shooting, it did not continue straight, Plaintiff had no explanation for the route he took after the shooting, Plaintiff stated that he immediately did a U-turn by the school but POD camera shows that he drove after the shooting, Plaintiff denied being in a traffic accident despite video footage of the crash and major damage to his car, Plaintiff stated he only had three looted bags in his car but video footage showed significantly more things in his back trunk, Plaintiff said he provided his contact info to hospital security, but they had no such information and Plaintiff did not call 911 or make a tip about the incident as the only witness to a murder in his car. Plaintiff's wife also inexplicably cleaned up the crime scene in his car. (Ex. 2, Evangelides Dep. at 265:20-267:17; 272:23-274:23; Ex. 3, Potter dep. at 267:19-334:24; Ex. 4, Reiff Dep. at 184:3-5, 189:18-190:13, 193:12-20; Ex. 21, Sup. Report at 2422).

42. Based on the inconsistencies, deception and the inculpatory evidence, Plaintiff went from a witness to a suspect in the shooting. At 7:10 PM he was placed under arrest for murder. (Ex. 3, Potter

Dep. at 267:19-334:24; Ex. 4, Reiff Dep. at 208:22-209:8; Ex. 15, GPRs at City 2489). Plaintiff was moved into a different interview room which was equipped with a video recording device which was activated and at 7:18 PM he was provided *Miranda* warnings. He agreed to answer questions and the post-arrest interview is captured on video ("ERI"). (Ex. 2, Evangelides Dep. at 264:19-21, 266:8-18; Ex. 15, GPRs at City 2422; Ex. 21, Sup. Report at City 2422).

43. In the recorded interview, Det. Evangelides summarized and referred back to the information Plaintiff had stated in the pre-arrest witness interview, which Plaintiff did not contest. (See generally, Ex. 43, Plaintiff ERI). Plaintiff repeated the same account that he provided in his initial interview. *Id.* During his video recorded statement, Plaintiff also stated that:

   a. Earlier police went to his house, and Plaintiff agreed to come voluntarily to speak to detective. (Ex. 43, Plaintiff ERI at 19:13:02-19:13:14).

   b. Plaintiff was the only one driving his car that night. (Ex. 43, Plaintiff ERI at 19:35:29-19:35:49).

   c. Both front seats of the Rav-4 were fully upright, they were not leaning back. (Ex. 43, Plaintiff ERI at 19:24:32-19:24:39).

   d. The incident occurred on May 31, 2020, a night with rioting, looting and chaos throughout the city. (Ex. 43, Plaintiff ERI at 19:14:46-19:13:14).

   e. That evening Plaintiff had been with his wife Jackie Anderson at Jackie's mother's house. (Ex. 43, Plaintiff ERI at 19:15:12-19:15:29).

   f. Plaintiff and Jackie left Jackie's mother's house together and while driving around, Plaintiff observed several grocery bags in the street and put the bags in the back of his car. (Ex. 43, Plaintiff ERI at 19:15:05-19:16:52).

19

g.  He dropped Jackie off at home with two grocery bags and then left the house to go to the gas station to buy cigarettes. (Ex. 43, Plaintiff ERI at 19:16:52-19:17:29).

h.  Plaintiff confirmed that he was driving a 2009 Silver Toyota Rav-4. (Ex. 43, Plaintiff ERI at 19:17:34-19:17:45).

i.  After going to the gas station, he picked up the victim at the AutoZone located at 76th and Stony Island. (Ex. 43, Plaintiff ERI at 19:19:28-19:19:47).

j.  He did not know the victim but had seen him around. (Ex. 43, Plaintiff ERI at 19:24:18-19:24:34).

k.  The victim had no bags or belongings with him when he got into the front passenger seat of his car. (Ex. 43, Plaintiff ERI at 19:19:46-19:20:11).

l.  While driving northbound on Stony Island, he stopped at the red light at 63rd when a tan colored car pulled up next to him and Plaintiff. (Ex. 43, Plaintiff ERI at 19:20:45-19:21:54).

m.  Plaintiff's window was down and the passenger window of the car to his left was down all the way. (Ex. 43, Plaintiff ERI at 19:21:57-19:24:20).

n.  Plaintiff observed a male black in the car's front passenger seat who stared into Plaintiff's car. (Ex. 43, Plaintiff ERI at 19:21:47-19:22:57).

o.  Plaintiff heard a gunshot, and upon hearing the gunshot he ducked down. (Ex. 43, Plaintiff ERI at 19:21:44).

p.  Plaintiff stated that "the moment th[e] car pulled up…instantly the shot went off." (Ex. 43, Plaintiff ERI at 19:23:29).

q.  After the gunshot, Plaintiff stated that the car next to him drove straight northbound on Stony Island, as did Plaintiff. (Ex. 43, Plaintiff ERI at 19:25:48-19:26:18).

r. Plaintiff noticed his passenger was shot, he immediately did a U-turn within seconds to drive the victim to the hospital. (Ex. 43, Plaintiff ERI at 19:26:42-19:27:20).

s. Plaintiff stated that he was not in a traffic accident. (Ex. 43, Plaintiff ERI at 19:27:20-19:27:47).

t. Plaintiff dropped victim off at St Bernard hospital and gave security officers his name and information. (Ex. 43, Plaintiff ERI at 19:27:28-19:28:04; 19:30:22-19:31:46).

u. Plaintiff admitted he did not call the police after the shooting. (Ex. 43, Plaintiff ERI at 19:30:22-19:31:46). Plaintiff admitted he had a cell phone on him at the time of the shooting. (Ex. 43, Plaintiff ERI at 19:31:33-19:31:38).

v. When questioned as to why he never called police, Plaintiff stated that he "didn't want to get involved in all that." (Ex. 43, Plaintiff ERI at 19:30:22-19:31:46).

w. Plaintiff assumed that police would contact him since he gave security his information. (Ex. 43, Plaintiff ERI at 19:30:22-19:31:26).

x. Plaintiff stated that security did not write anything down when he gave his information. (Ex. 43, Plaintiff ERI at 19:34:10-10:34:40).

y. Plaintiff further admitted that he never called the police after any traffic accident. (Ex. 43, Plaintiff ERI at 19:32:43-19:33:25).

z. Plaintiff's wife Jackie had cleaned the car after the shooting. (Ex. 43, Plaintiff ERI at 19:33:25-19:33:45).

44. When detectives confronted Plaintiff with his inconsistencies with the evidence gathered, Plaintiff was unable to explain the inconsistencies and eventually requested a lawyer. (Ex. 43, Plaintiff ERI at 19:39:10-19:42:22). Detectives immediately terminated the interview. (Ex. 43, Plaintiff ERI at 19:39:10-19:42:22).

45. Two years later, at his deposition, Plaintiff stated that during his police interview, he was ill because his blood sugar was up and he was having chest pains. (Ex. 16, Plaintiff Dep., 244: 16-245:17, 258:11-259:14). Plaintiff never told Detectives that he was feeling ill or that he was having any health issues. (Ex. 2, Evangelides Dep. at. 251:7-13; Ex. 16, Plaintiff Dep. at 244:9-245:17; Ex. 34, Perez Dep at 95:14-96:23, 107:10-21, 106:3-108:7, 111:8-15, 226:14-228:24; Ex. 43, Plaintiff ERI at 19:12:15-19:42:22).

### Cook County State's Attorneys Office's Felony Review

46. On August 29, 2020, the day after Plaintiff was arrested, a felony review Assistant State's Attorney ("ASA"), Craig Taczy, came to the police station to review the case and determine whether murder charges would be filed. (Ex. 15, GPRs at City 2494; Ex. 21, Sup. Report at City 2423).

47. The Cook County State's Attorney's Office Felony Review Unit's prosecutors make charging decisions based on their independent review of the evidence in an investigation. They can either approve felony charges, reject felony charges, or continue an investigation, also known as a "C.I", which is when the prosecutor requests additional information from police to complete their review. The prosecutor can also approve charges different than what a detective requested. When charges are approved it indicates that the reviewing prosecutor believes there is probable cause for the charge. As the SAO supervisor who dismissed charges against Plaintiff, ASA Waller testified, probable cause is the *minimum* level felony review prosecutors are looking for before approving charges. Felony review prosecutors do not rubber stamp approval of charges, but instead, "mak[e] your own determinations about the evidence and- and how that relates to the charges being sought." (Ex. 46, Deposition of Craig Taczy taken on February 23, 2024 at 91:24-92:21, 98:3-101:19, 102:11-103:13; Ex. 47, Deposition of Patrick Waller taken on March 21, 2024 at 9:4-13:20, 41:18-23, 51:2-58:19).

48. When an ASA reviews a case, their review is memorialized in what is called a case fact sheet in the SAO's case management system called CRIMES; the case fact sheet includes the evidence reviewed by the ASA and is used throughout the prosecution of the case. A case fact sheet was created by the SAO pursuant to ASA Taczy's review of the case and includes the prosecutor's summary of the investigation. The summary references the hospital video, interviews with the victim's family, speed camera videos, license plate reader data, Plaintiff's interviews and the POD video. The contents of the POD video are described in detail, noting that the passenger window of the black car to the left of the Rav-4 appeared rolled up. The summary also references Plaintiff's prior convictions for Aggravated Discharge of a Firearm and Attempted Murder. (Ex. 46, Taczy Dep. at 27:1-10, 104:5-106:19 108:4-110:21, 119:1-120:7; Ex. 47, Waller Dep. at 58:2-63:18, 64:5-66:21; Ex. 48, Cook County State's Attorney's Office Fact Sheet at CCSAO 1335-1336).

49. After his initial review of the case, on August 29, 2020, ASA Taczy continued the investigation for: an interview of Jaqueline Anderson (Plaintiff's wife), search warrants to be issued for Herring's medical records and for Plaintiff's phone, and a determination from the M.E. whether the evidence supported a close-range shooting. (Ex. 2, Evangelides Dep. at 300:17-301:13, 328:3-6; Ex. 48, CCSAO Fact Sheet at CCSAO 1332, 1337; Ex. 49, CCSAO Event Report).

50. On August 29, 2020 Det. Reiff and Det. Evangelides interviewed Jacqueline Anderson. (Ex. 2, Evangelides Dep. at 301:18-304:8; Ex. 4, Reiff Dep. at 218:22-24; Ex. 15 at GPRs at 2493; Ex. 21, Sup. Report at 2423). Det. Evangelides did most of the talking and Reiff took GPR notes. (Ex. 4, Reiff Dep. at 218:7-24, 225:8-12). Jackie confirmed that she cleaned the blood out of the car. (Ex. 4, Reiff Dep. at 226:4-6, 234:24-237:19).

51. As of late August the medical examiner had not completed the report of Herring's autopsy. (Ex. 22, Herring's Autopsy Report). On August 30th Det. Lapadula called the medical examiner's

office and spoke to Dr. Kahn, who had completed the physical autopsy, she related that it was possible the gunshot came from within the vehicle's cabin. (Ex. 5, Lapadula Dep. at 18:14-19:18, 20:3-17, 21:4-24, 30:31:3, 44:13-24, 48:10-16, 25:11-25; Ex. 15, GPRs at City 2497; Ex. 21 Sup. Report at City 2423; Ex. 45, Khan Dep at 53:20-54:10, 86:5-89:18).

52. On August 30th Det. Potter drafted multiple search warrants and sought judicial approval; specifically, he drafted a search warrant for Plaintiff's cell phone, search warrant for records for the phone number 708-XXX-3968, the number Herring used the night of his murder, and a search warrant Herring's medical records. (Ex. 51, August 30, 2020 Search Warrants at City 2539-2555).

53. On August 30, 2020 at 11:40 AM, after his C.I. list had been addressed, ASA Taczy approved first degree murder charges. (Ex. 47, Waller Dep. at 63:1-65:21; Ex. 48, CCSAO Fact Sheet at 1335; Ex. 49, CCSAO Event Report).

## Judicial Determinations of Probable Cause

54. On August 30, 2020, to ensure that Plaintiff was brought before a judge within 48 hours of being in custody, a detention hearing, also known as a *Gerstein* hearing, was held remotely.[8] A bond court hearing was held on August 31, 2020. Finally, there was a grand jury indictment on September 17, 2020. Probable cause was found at all three hearings. (Ex. 52, Detention Hearing held on August 30, 2020 at NKDEFS-CCPD 99-106; Ex. 53, Bond Court Hearing held on August 31, 2020 at NK DEFS 327-339; Ex. 54, Grand Jury Hearing held on September 17, 2020 at CCSAO 581-589).

55. At the *Gerstein* detention hearing, the judge stated which reports she had received from Det. Potter and reviewed a probable cause statement for judicial determination, felony complaints for the charge of First-Degree Murder, Plaintiff's arrest report, the Original Case Incident Report, and Felony

---

[8] This transcript indicates Det. Carol Potter testified; that is an error, it was Det. Dale Potter. (See Ex. 3, Potter Dep at 101:7-8 stating his star number as #21649 and see Ex. 52, Detention Hearing at 1:15 stating the same star number).

Minutes. (Ex. 52, Detention Hearing at 5:1-12). None of these records reference ShotSpotter. (Ex. 52, Detention Hearing at 5:5-12; Group Ex. 55, Det. Potter email and documents sent to Judge Silva on August 30, 2020). Det. Potter was present for the hearing as well. Judge Silva asked Det. Potter a few clarifying questions regarding Plaintiff's car, video of the car, who was present in the car, and the timeframe between the incident and the victim's death. (Ex. 52, Detention Hearing at 6:5-7:2). Then Judge Silva stated because of her review of the documents submitted, she was finding probable cause to detain. (Ex. 52, Detention Hearing at 7:13-18).

56. The next day, August 31, 2020, Plaintiff appeared in bond court before Judge Lyke. (Ex. 53, Bond Court Hearing at NK DEFS 327). Judge Lyke stated there is finding of probable cause to detain. (Ex. 53, Bond Court Hearing at 2:8-10). A Cook County ASA, James Murphy, provided a proffer of the facts surrounding the homicide. (Ex. 53, Bond Court Hearing at 2:18-8:16). This proffer was based on a written proffer created by a Cook County ASA. (Ex. 56, Bond Court Proffer Script). The only mention of ShotSpotter at the bond hearing was ASA Murphy's proffer that ShotSpotter detected one shot fired at the time Plaintiff's vehicle is observed in the intersection of 63rd and South Stony Island. (Ex. 56, Bond Court Proffer Script at 5:8-14).

57. The proffer is detailed tracks with the narrative section of the case fact sheet authored by the felony review ASA. (Ex. 48, CCSAO Fact Sheet; Ex. 53, Bond Court Hearing). ASA Murphy added additional points to the proffer: That the University of Chicago Hospital and Jackson Park Hospital were closer to where the victim was shot than St. Bernard Hospital where Plaintiff drove the victim. (Ex. 53, Bond Court Hearing at 6:6-9). He also presented Plaintiff's prior conviction for aggravated discharge of a firearm in 01 CR 396 where he fired a gun at the feet of his stepson after he refused to leave the house for not changing the channel on the T.V.; a 1995 conviction for robbery; and Plaintiff's attempt murder conviction from 1978 which carried a 30 year sentence to the Illinois Department of

25

Corrections. (Ex. 53, Bond Court Hearing at 7:9-17). The ASA requested no bail. (Ex. 53, Bond Court Hearing at 7:18-8:16). Judge Lyke stated "The Court further finds that the proof is evident and the presumption is great that he indeed committed this offense." (Ex. 53, Bond Court Hearing at 11:2-4). Judge Lyke, based on the ASA's proffer ordered that Plaintiff be held without bail. (Ex. 53, Bond Court Hearing at 11:7-8).

58. On September 17, 2020, ASA Esmerelda Rubio presented the case to the Grand Jury for indictment. (Ex. 54, Grand Jury Hearing; Ex. 57, Deposition of Esmeralda Rubio taken on February 28, 2024 at 43:10-13). In preparation for presenting a case to the Grand Jury, Rubio testified she would review the case fact sheet created by the felony review ASA, speak to witnesses, review video, any reports, bond court proffers, and meet with a testifying detective. (Ex. 57, Rubio Dep. at 10:17-14:13, 18:12-19: 15, 30:16, 47:23-49:5, 54:21-56:13). In this case she asked Det. Evangelides to testify. (Ex. 57, Rubio Dep. at 22:17-23:23).

59. ASA Rubio was responsible for deciding what charges to seek indictment on, drafting the charging language, questioning of witnesses and presenting the case to the Grand Jury. The Grand Jury then decides if they should indict a case, meaning that the prosecution has met their burden of showing probable cause. (Ex. 57, Rubio Dep. at 24:6-19, 43:10-13, 44:16-18, 63:15-64:9).

60. In summary, the Grand Jury heard the following in the form of leading questions from ASA Rubio:

    a.   That Plaintiff was driving with Herring in the front seat of his Toyota near 6301 South Stony Island. (Ex. 54, Grand Jury Hearing at 4:1-6).

    b.   That the investigation revealed Plaintiff shot Herring in the head. (Ex. 54, Grand Jury Hearing at 4:7-15).

    c.   That ShotSpotter detected one shot fired in the vicinity of 63rd and South Stony Island. (Ex. 54, Grand Jury Hearing at 4:16-5:1).

    d.   The POD video captured the Toyota at the area of 63rd and Stony Island during the time the gunshot was detected by ShotSpotter. (Ex. 54, Grand Jury Hearing at 4:21-5:1).

    e.   Plaintiff drove his Toyota to a hospital and dropped off the victim and that was captured on video. (Ex. 54, Grand Jury Hearing at 5:2-19).

    f.   That the victim died and a postmortem examination revealed died of a gunshot wound to the head and the manner of death was homicide. (Ex. 54, Grand Jury Hearing at 5:20-6:6).

    g.   That the Toyota is registered to Plaintiff. (Ex. 54, Grand Jury Hearing at 6:7-9).

    h.   That Plaintiff gave a statement to police that the victim was shot by an unknown person while in traffic and that the only people in Plaintiff's vehicle were Plaintiff and the victim. (Ex. 54, Grand Jury Hearing at 6:17).

61. The Grand Jury had no questions and returned a true bill of indictment. (Ex. 54, Grand Jury Hearing at 6:18-7:2).

## Criminal Case

62. Plaintiff's criminal case was assigned to Judge Vincent Gaughn's Courtroom. (Ex. 47, Waller Dep. at 15:22-24). Assistant State's Attorneys Andres Almendarez and Patrick Waller were assigned to prosecute the case. (Ex. 47, Waller Dep. at 15:25-16:9). Plaintiff was arraigned on October 8, 2020. (Ex. 58, 20CR0899601 Cook County Portal Case Information at Williams 6). For the next 11 months, the parties exchanged discovery. (Ex. 58, 20CR0899601 Case Information at Williams 1-6).

63. On April 22, 2021, defense counsel filed a motion to exclude ShotSpotter evidence pursuant to *Frye* and Rule 403 based on the ShotSpotter evidence in the case. (Ex. 58, 20CR0899601 Case Information at Williams 5). On June 11, 2021 ASA Waller indicated to the court that the State would

not be using the ShotSpotter evidence in its prosecution, thus negating the need for a *Frye* hearing. (Ex. 47, Waller Dep. at 23:24-13; Ex. 59, June 11, 2021 Status Hearing at CCSAO 573). The case was continued. (Ex. 58, 20CR0899601 Case Information at Williams 2-4).

64. ASA Waller has worked at the CCSAO for 18 years. (Ex. 47, Waller Dep. at 8:18-20). He is currently the Chief of the Special Prosecutions Bureau that covers specialized prosecution units such as gang and gun crime, public corruption, financial crimes, human trafficking, complex narcotics, sexual assault, domestic violence, asset forfeiture, consumer fraud, and seniors and persons with disabilities (Ex. 47, Waller Dep. at 8:18-20; 12:13-13:1). In July of 2021, Waller was the supervisor of the forensic science unit at the SAO. (Ex. 47, Waller Dep. at 11:21-12:5).

65. On July 6, 2021, ASA Waller submitted a memorandum to his supervisors detailing his decision that the State could not meet their burden of proof at trial. (Ex. 47, Waller Dep. at 40:17-42:7; Ex. 60, Patrick Waller July 6, 2021 Memorandum ("Memo"). The memo seeks dismissal based on Waller's analysis that the State cannot meet their burden of proof at trial-- proof beyond a reasonable doubt. (Ex. 47, Waller Dep. at 78:12-79:17; Ex. 60, Waller Memo at p. 5). Waller understood that proof beyond a reasonable doubt is the burden at trial that the State must meet for a conviction, and that it is a higher burden than probable cause, which is the burden required for an arrest. (Ex. 47, Waller Dep. at 72:25-74:11). The memorandum does not indicate any deficiency in probable cause nor does it indicate the case should be dismissed based on any probable cause concerns; probable cause is not addressed in the memo whatsoever. (Ex. 47, Waller Dep. at 75:15-79:17; Ex. 60, Waller Memo).

66. Waller made this recommendation without speaking to the St. Bernard Hospital security guards to determine if Plaintiff was credible in his claim he gave them his information, nor did Waller speak to the medical examiner regarding the range of fire, he also did not consult with experts on

bullet trajectory or blood pattern analysis. (Ex. 47, Waller Dep. at 95:3-8; 95:18-99:10; Ex. 61, ISP Report ISP Report #5, ISP Subpoena Response 22-29). He likewise did not interview any civilian witnesses, such as Ricky Patterson to address the potential motive in Plaintiff's actions as they relate to Herring. (Ex. 47, Waller Dep. at 100:13-101:16).

67. Waller received permission to dismiss the case and on July 23, 2021 the CCSAO moved to dismiss the charges. (Ex. 47, Waller Dep. at 20:15-21:5, TAC ¶¶73-73). Plaintiff was released from Cook County Jail on July 31, 2021, which was 11 months and 3 days from the date of his arrest. (TAC ¶76).

DATED: October 22, 2025                                    Respectfully Submitted,


                                                          **CITY OF CHICAGO**
                                                          By: *s/ Neha Locke*

                                                          Avi T. Kamionski
                                                          Shneur Nathan
                                                          Neha Locke
                                                          Helen O'Shaughnessy
                                                          Ashley Brody
                                                          *Counsel for Defendant Officers*
                                                          Nathan & Kamionski, LLP
                                                          206 S. Jefferson St.
                                                          Chicago, IL 60661
                                                          nlocke@nklawllp.com

## CERTIFICATE OF SERVICE

I, Neha S. Locke, an attorney, hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent electronic notification of the filing on the same day to all counsel of record.

*s/ Neha S. Locke*