**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS EASTERN
DIVISION**

| | | |
|---|---|---|
| MICHAEL WILLIAMS, et. al. | ) | |
| | ) | Case No. 24-cv-1396 |
| Plaintiff, | ) | (previously 22-cv-3773) |
| | ) | |
| vs. | ) | |
| | ) | Honorable Georgia N. Alexakis |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT OFFICERS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.    THERE IS A MATERIAL DISPUTE OF FACT AS TO WHETHER THERE WAS
      PROBABLE CAUSE TO ARREST, DETAIN, AND CHARGE PLAINTIFF ................... 2

      A.    A JURY CAN FIND THERE WAS NO PROBABLE CAUSE ................................... 2

            1.    Plaintiff's Account Is Consistent with CPD's Video Surveillance ......................... 2

            2.    Defendants Had No Reasonable Basis To Exclude the Black Sedan as the Source
                  of Gunfire ................................................................................................. 5

            3.    Defendants Knew Facts Pointing to the Black Sedan as the Source of the Fatal
                  Gunshot .................................................................................................... 7

            4.    Defendants' Argument for Probable Cause Fails ...................................... 8

      B.    SUFFICIENT FACTS REBUT A PRESUMTION OF PROBABLE CAUSE ........... 14

            1.    August 30 *Gerstein* Hearing ..................................................................... 15

            2.    August 31 Bond Hearing .......................................................................... 16

            3.    September 17 Grand Jury Indictment ....................................................... 17

            4.    Defendants' False and Misleading Statements and Omissions Were Material To
                  Probable Cause ........................................................................................ 18

            5.    Prosecutors' So-Called "Independent Review" Does Not Break the Chain of
                  Causation ................................................................................................. 19

II.   PLAINTIFF'S MALICIOUS PROSECUTION CLAIMS MUST PROCEED .................. 21

      A.    A Jury Can Find the Absence of Probable Cause ....................................... 22

      B.    A Jury Can Find Malice ............................................................................. 22

      C.    A Jury Can Find Favorable Termination .................................................... 24

III.  THERE IS SUFFICIENT EVIDENCE OF PERSONAL INVOLVEMENT BY
      DEFENDANTS RONEY, REIFF, AND LAPADULA ..................................................... 25

IV.   PLAINTIFF'S CONSPIRACY CLAIMS MUST PROCEED ......................................... 26

V.    PLAINTIFF'S FAILURE TO INTERVENE CLAIM MUST PROCEED ......................... 28

VI.   DEFENDANTS ARE NOT IMMUNE ......................................................................... 28

CONCLUSION .................................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. United States*,
    721 F.3d 418 (7th Cir. 2013) ..................................................................................... 33

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................................... 6

*Beaman v. Freesmeyer*,
    2021 IL 125617, 183 N.E.3d 767 ...................................................... 26, 27, 28, 29

*Beauchamp v. City of Noblesville, Ind.*,
    320 F.3d 733 (7th Cir. 2003) ..................................................................................... 19

*Beck v. Ohio*,
    379 U.S. 89 (1964)................................................................................................13, 32

*Betker v. Gomez*,
    692 F.3d 854 (7th Cir. 2012) ..................................................................................... 22

*Brown v. City of Chicago*,
    No. 19 CV 4082, 2025 WL 2785426 (N.D. Ill. Sept. 30, 2025).............................. 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................................... 6

*Chelios v. Heavener*,
    520 F.3d 678 (7th Cir. 2008) ................................................................................33, 34

*Coleman v. City of Chicago*,
    No. 17-CV-08696, 2025 WL 2410325 (N.D. Ill. Aug. 20, 2025)............................. 29

*Currie v. Chhabra*,
    728 F.3d 626 (7th Cir. 2013) ..................................................................................... 34

*Donnelly v. Chicago Park Dist.*,
    417 F. Supp. 2d 992 (N.D. Ill. 2006) ....................................................................... 28

*Flowers v. Renfro*,
    46 F.4th 631 (7th Cir. 2022) ..................................................................................... 34

*Fox v. Hayes*,
    600 F.3d 819 (7th Cir. 2010) ................................................................................6, 33

*Franks v. Delaware,*
    438 U.S. 154 (1978) ................................................................... 33

*Fulton v. Bartik,*
    No. 20 C 3118, 2024 WL 1242637 (N.D. Ill. Mar. 22, 2024) ................................................ 29

*Gardley v. City of Chicago,* No. 20 C,
    No. 20 C 5149, 2022 WL 6757610 (N.D. Ill. Oct. 11, 2022) ............................................ 28, 29

*Guzell v. Hiller,*
    223 F.3d 518 (7th Cir. 2000) .......................................................... 33

*Hampton v. Hanrahan,*
    600 F.2d 600 (7th Cir. 1979) .......................................................... 31

*Harris v. Wainscott,*
    No. 18 cv 2789, 2019 WL 1995270 (N.D. Ill. May 5, 2019) .................................................. 35

*Hill v. City of Harvey,*
    No. 17 C 4699, 2020 WL 5800729 (N.D. Ill. Sept. 29, 2020) ............................................. 31

*Holt v. City of Chicago,*
    2022 IL App (1st) 220400 214 N.E.3d 877 ............................................. 26

*Hurt v. Wise,*
    880 F.3d 831 (7th Cir. 2018) ......................................................31, 34

*Jackson v. City of Chicago,*
    No. 22 C 4337, 2024 WL 5264703 (N.D. Ill. Dec. 31, 2024) ........................................27, 28

*Jones v. City of Chicago,*
    856 F.2d 985 (7th Cir. 1988) .................................................. 19, 31, 33

*Lawson v. Veruchi,*
    637 F.3d 699 (7th Cir. 2011) .......................................................... 33

*Maltby v. Winston,*
    36 F.3d 548 (7th Cir. 1994) .........................................................29, 30

*Maxwell v. City of Indianapolis,*
    998 F.2d 431 (7th Cir. 1993) ........................................................... 6

*McCottrell v. White,*
    933 F.3d 651 (7th Cir. 2019) .......................................................... 16

*Moore v. Marketplace Rest., Inc.*,
    754 F.2d 1336 (7th Cir. 1985) ...................................................................12, 33

*Narducci v. Moore,*
    572 F.3d 313 (7th Cir. 2009) ............................................................................ 34

*Olson v. Tyler*,
    771 F.2d 277 (7th Cir. 1985) ............................................................................ 33

*Pearson v. Callahan,*
    555 U.S. 223 (2009)........................................................................................... 32

*Petit v. City of Chicago,*
    352 F.3d 1111 (7th Cir. 2003) .......................................................................... 18

*Rainsberger v. Benner,*
    *913 F.3d 640* (7th Cir. 2019) .....................................................................16, 22

*Richardson v. City of Indianapolis,*
    658 F.2d 494 (7th Cir. 1981) ............................................................................ 31

*Sornberger v. City of Knoxville, Ill*.,
    434 F.3d 1006 (7th Cir. 2006) ..................................................... 10, 17, 32, 33

*Starks v. City of Waukegan,*
    946 F. Supp. 2d 780 (N.D. Ill. 2013) ............................................................... 29

*Stephenson v. City of Chicago,*
    No. 21 CV 338, 2024 WL 3251346 (N.D. Ill. July 1, 2024).......................... 25

*Swick v. Liautaud,*
    169 Ill.2d 502 (1996) ........................................................................................ 28

*United States v. Glover,*
    755 F.3d 811 (7th Cir. 2014)............................................................................. 13

*United States v. Bullock,*
    No. 20-cr-2018, 2020 WL 5553562 (N.D. Iowa Aug. 21, 2020) ................... 18

*United States v. Coleman*
    20 CR 742, 2021 WL 3910141 (N.D. Ill. Sept. 1, 2021)................................. 18

*United States v. Chivers,*
    No. 1:19-cr-119, 2020 WL 5757135 (S.D. Ohio Sept. 28, 2020)................... 18

*United States v. Hensley,*
  469 U.S. 221 (1985)................................................................................ 12

*United States v. Ingrao,*
  897 F.2d 860 (7th Cir. 1990) .................................................................. 13

*United States v. Nafzger,*
  974 F.2d 906 (7th Cir. 1992) .............................................................. 11, 12

*Washington v. City of Chicago,*
  98 F.4th 860 (7th Cir. 2024) ................................................................... 24

*Washington v. Haupert,*
  481 F.3d 543 (7th Cir. 2007) .................................................................. 13

*Williams v. City of Chicago,*
  733 F.3d 749 (7th Cir. 2013) ........................................................ 13, 33, 34

**Statutes**

745 ILCS 10/1-210................................................................................... 34

## INTRODUCTION

Plaintiff Michael Williams is an innocent man who was caught up in a drive-by shooting on the evening of May 31, 2020, at the height of the unrest following the police killing of George Floyd. Plaintiff agreed to give a young man a ride home when, a few minutes later, a Dodge Charger pulled up alongside his Toyota RAV4 at a stoplight, fired though his open driver-side window, and struck the young man in the head. Plaintiff did exactly what any responsible person would do: he sped the victim to the hospital, went inside, and sought out an official at the hospital to provide his information. He could not stay because of COVID protocols. He did not hide from police. Months later, after collecting vast surveillance footage of the night's events, Defendants requested to interview Plaintiff, and he agreed. He gave Defendants his best recollection of what had happened during those traumatic moments three months earlier. The surveillance footage corroborated Plaintiff's account.

Despite all this, Defendants arrested Plaintiff and caused him to be charged with murder and jailed for 11 months. It was only after prosecutors finally reviewed the evidence for themselves and realized they had no case that Plaintiff's liberty was restored. Defendants are entirely responsible for Plaintiff's prosecution and detention. They arrested him without any reasonable basis to believe the shot came from inside Plaintiff's car (as opposed to the Charger) and without any reasonable basis to discredit his account. To secure Plaintiff's detention and criminal charges, Defendants made false and misleading statements and concealed exculpatory evidence from courts, prosecutors, and grand juries. Defendants contend they are entitled to summary judgment because there was probable cause for them to detain Plaintiff and seek murder charges against him. However, central facts upon which Defendants base probable cause—and the facts regarding their misconduct during the investigation—are disputed, precluding summary judgment. The Court should deny Defendants' motion.

1

## ARGUMENT

The standard here is familiar: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citation omitted).

## I.  THERE IS A MATERIAL DISPUTE OF FACT AS TO WHETHER THERE WAS PROBABLE CAUSE TO ARREST, DETAIN, AND CHARGE PLAINTIFF

Defendants contend that they should prevail because Defendants' actions were supported by probable cause, and because the prosecutors' actions break causation. Both arguments fail because these are not issues that can be decided at summary judgment.

### A.  A JURY CAN FIND THERE WAS NO PROBABLE CAUSE

To determine probable cause at summary judgment, the Court must assess all relevant facts and view the factual record in the light most favorable to Plaintiff. *Fox v. Hayes*, 600 F.3d 819, 834 (7th Cir. 2010). This "question . . . is a proper issue for the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). When viewed in this light, there are more than sufficient facts to support a jury trial on the issue of probable cause.

#### 1. Plaintiff's Account Is Consistent with CPD's Video Surveillance

On the evening of May 31, 2020, Plaintiff was a 63-year-old resident of the South Side. It was the height of the protests following the police murder of George Floyd, and the day was marked by unrest and chaos across the City. Defendants' Statement of Facts ("DSF") 7. Plaintiff went out to buy cigarettes and, on his way back, he encountered a young man waving him down

2

near the parking lot of the AutoZone at 76th St. and Stony Island Ave. Plaintiff's Statement of Additional Facts ("PSF") 1-2 (ECF No. 180). The young man, now known to be Safarian Herring, was looking for a ride home; he had just borrowed a phone to try unsuccessfully to reach family for a ride. PSF 2; DSF 17-18. Plaintiff pulled over and spoke with him. PSF 2. Plaintiff thought he recognized him from the neighborhood and agreed to drive him home. DSF 40d; PSF 2.

The two drove northbound up Stony Island Avenue in Plaintiff's silver RAV4 toward Herring's home, with Herring in the passenger seat. PSF 3. Plaintiff's driver side window was rolled down. PSF 4. As Plaintiff drove north, a black-four door sedan followed a few seconds behind, which is visible on surveillance video. PSF 5.

Plaintiff stopped at a red light at the intersection of 63rd and Stony Island. PSF 6. A few seconds later, a black sedan—apparently the same one that had been following behind—pulled into the left-turn lane along the driver side of Plaintiff's car, coming to a stop. PSF 7.

At that moment someone in the black sedan fired the fatal shot into Plaintiff's car, narrowly missing Plaintiff as the bullet entered through his open window and struck Herring in the left forehead. PSF 8-9. A ShotSpotter alert detected the gunshot in the general area of the intersection and timestamped it at 11:46:28 p.m. PSF 8-9.

In response, Plaintiff slammed the gas and slid down very low in his seat to avoid additional gunshots he thought could be coming. PSF 13. As he was speeding straight north along Stony Island with his head ducked low, he looked up at his passenger and realized that the young man was slumped forward bleeding. PSF 14. Plaintiff's fear then combined with an urgent mission to get the young man help at a hospital. *Id.* He pulled a U-Turn on Stony Island, making a beeline for a hospital he knew to be nearby, St. Bernard's. PSF 15.

3

This account of what happened, which Plaintiff recounted to Defendants, is all consistent with CPD's extensive surveillance footage. A Police Observation Device (POD) camera surveilled the intersection at 63rd Street where the shot was fired. PSF 10. The camera's frame only reached the crosswalk ahead of where Plaintiff's RAV4 was stopped. PSF 10. But video shows the shadows that were cast by Plaintiff's RAV 4 onto the crosswalk as he came to complete stop around 11:46:25 p.m. PSF 6. Seconds later, as Plaintiff told detectives, the video shows the black sedan pull up on Plaintiff's driver side in the left-turn lane: reflections from the sedan's headlights appear in the crosswalk around 11:46:27, and the sedan then creeps forward slowly into the crosswalk with its headlights and hood just entering the frame at the fatal moment: 11:46:28 p.m. PSF 10. The black sedan comes to a very brief stop with only its hood visible in the crosswalk. PSF 7. Both cars then suddenly accelerate forward, peeling through the red light. PSF 11; Plaintiff's Response to Defendants' Statement of Facts ("PRDSF") 26d (ECF No. 186). The sedan takes off and turns westbound onto 63rd while Plaintiff's SUV accelerates straight up Stony Island. PRDSF 26d. The video later shows Plaintiffs' RAV4 doubling back down Stony Island after having done a U-Turn, then speeding westbound on 63rd to St. Bernards. PRDSF 26e.

At the hospital, Plaintiff immediately got help for the victim and then went out of his way to find a person in authority to speak with. PRDSF21; PSF 17-19. When Plaintiff pulled into the Ambulance Bay, he summoned the EMTs, then exited the vehicle while the EMTs and other staff moved the victim onto a stretcher and wheeled him into the Emergency Room. PSF 16; PRDSF 20d. All of the EMTs and staff went back inside to tend to the victim, leaving Plaintiff all alone outside. PSF 16. He then got back in his RAV4, drove straight to the parking lot across from the hospital, then walked back across the street alone to enter the ER. PSF 17. All of this was captured on the Ambulance Bay surveillance video. PSF 16-17.

4

Once inside the hospital, Plaintiff tried to get the attention of multiple staff. He spoke with a person he thought was a doctor, but she told him he needed to leave because of COVID protocols. PSF 19. Nonetheless, he persisted and eventually got the attention of a uniformed security guard. PSF 18. The guard eventually summoned Plaintiff, who walked with the guard to another area off camera. PRDSF 21. There, Plaintiff provided the guard with his name and information, and explained that the victim had been shot while in his car and that he had brought the victim to the hospital. PSF 18. The guard repeated hospital COVID policy. PSF 19. A few minutes later, Plaintiff returned to the ER entrance. PRDSF 21 He lingered for a time but eventually complied with policy and left. *Id.* Hospital surveillance footage entirely corroborates this: Plaintiff is captured speaking with multiple people including the security official. *Id.*

No reasonable person could describe what Plaintiff did there as "fleeing," and nobody at the hospital ever told police that he "fled," PRDSF 6, as the Defendant police officers continue to allege, *see* Defendants' Memorandum ("Defs Mem") at 14 (ECF No. 147). Unfortunately, the security guard did not record the information that Plaintiff had provided to him, PSF 18, so the hospital was unable to pass that information along to detectives. This was not Plaintiff's fault.

In the days and weeks that followed, Plaintiff did not hide from police. PSF 21; PRDSF 41. He made a point to park his RAV4 immediately in front of his home—the first place police would come looking. PRDSF 29, 38. When police finally came to his house to speak with him three months later, he readily agreed to go with them to the police station. PSF 21.

### 2. Defendants Had No Reasonable Basis To Exclude the Black Sedan as the Source of Gunfire

Defendants had no basis to exclude the black sedan as the source of the fatal shot and no reliable evidence placing the gunshot inside Plaintiff's car.

_The POD Video._ The POD video from 63rd and Stony Island does not show the windows of either vehicle when the shot was fired. At 11:46:28, the time of the fatal shot, the windows of the black sedan and all of Plaintiff's RAV4 are outside the frame. PSF 10-11. There is therefore no way to know if the windows on the sedan are up or down when the trigger is pulled: one or both may be down. _Id._ There is no visible gunshot or muzzle flash because the shot happens off camera. _Id._; _contra_ Defs Mem at 9. A few seconds later, when the black sedan travels through the intersection on camera, its rear passenger window remains down. PSF12; PRDSF 27. In short, the video does not allow a reasonable officer to conclude that the shot could not have come from the black sedan or that it did come from inside Plaintiff's RAV4. _Contra_ Defs Mem 9.

Likewise, the dispute about what the video shows at the rear passenger window a few moments later cannot be resolved at summary judgment. _See_ PRDSF 27; _Sornberger v. City of Knoxville, Ill._, 434 F.3d 1006, 1014 (7th Cir. 2006) (reversing summary judgment on the issue of probable cause where key evidence was "camera footage [that] itself lacked a clarity of resolution that made it difficult to discern significant detail" and "undermine[d] substantially the determination of probable cause").

_The Medical Examiner's Opinion_. The opinion of the medical examiner, Dr. Reema Khan, after she conducted her June 6 examination of the victim contradicts the notion that the shot was fired inside Plaintiff's car. Her examination showed no evidence of close range fire, which in her opinion meant no evidence the gun was fired within 3 to 4 feet of the victim and that it was probably fired from more than 4 or 5 feet away. PSF 30-31; PRDSF 51. No reasonable person could interpret the ME's opinion as excluding the black sedan as the source of the shooting—to the contrary, it pointed to that sedan as the likely source of such a gunshot.

_ShotSpotter_. Defendants do not rely on ShotSpotter for probable cause and the parties agree that the ShotSpotter evidence is consistent with the shot being fired in the general location of the intersection, including from the black sedan. _See_ Defs Mem 14, PRDSF 23.

In sum, as the Cook County State's Attorney's Office would later realize, "there is no evidence to support a conclusion that the gunshot was fired inside defendant's car." PSF 48.

### 3. Defendants Knew Facts Pointing to the Black Sedan as the Source of the Fatal Gunshot

Defendants had plenty of evidence to support that the shot came from the black sedan. Not only is one of the windows on the black sedan open after the shooting, _see_ PSF 12; PRDSF 27, but also Defendants developed substantial evidence that the same make/model of car—a Dodge Charger, _see_ PSF 22—was used in a rash of gang-related shootings with ties to the victim.

On June 4th and June 5th, just a few days after the shooting, there were CPD sent Defendant Roney "Daily Briefings" that identified two other recent gang-related drive-by shootings involving Dodge Chargers in the area, on June 2nd and 3rd. PSF 25. The Briefing said these shootings were part of an internal conflict within the Gangster Disciples—the same gang that the victim was in. PSF 25, 32. The Briefing included images of the black Dodge Chargers involved in these shootings, which were consistent with the Charger seen alongside Plaintiff's RAV4. PSF 27. The Briefing also contained information about a "crime pattern" of vehicles being carjacked by gunmen in the area. PSF 27. Remarkably, one of the cars in that crime pattern was a black Dodge Charger that, according to the bulletin, was carjacked by two men with handguns _45 minutes before Herring was shot_, only _three blocks_ from the fateful intersection at 63rd Street. _Id._ Ample facts in the record support an inference that the Defendant had this information, which was sent directly to Defendant Roney on two separate occasions, and which the officers were required to make themselves aware of part of their jobs. PSF 23-24, 28-29. _See also United States v. Nafzger_, 974 F.2d 906, 911 (7th

Cir. 1992) ("[W]hen officers are in communication with each other while working together at a scene, their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information . . . was conveyed.").[1]

Defendants also had evidence that linked the gang conflict and Charger shootings even more closely to the victim. The victim's mother told detectives that she had been warned that the victim's ex-girlfriend, Lashanna Patton, "was trying to set him up" to be killed. PRDSF 12. Defendants had information that Patton, too, was a member of the Gangster Disciples and that she had a history of arrests for assault. PSF 32. Defendants knew Herring was with Patton prior to being shot and that he had planned to meet her at the same AutoZone on 76th and Stony Island where he was later trying to find a ride home. PRDSF 12. Meanwhile, Defendants learned that Patton was making curious remarks in the immediate aftermath of her ex-boyfriend's shooting, telling one relative that "he probably shot himself in the head." PSF 33.

All these facts would lead a prudent officer to form a strong belief that the shot did not come from Plaintiff, but instead from the Charger. Moreover, Defendants did nothing to investigate or follow-up on *any* of these compelling facts about the gang conflict, Charger gunmen, or ex-girlfriend. PSF 29, 34, 35, 36. This further undermines probable cause. *See Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1345-46 (7th Cir. 1985) (probable cause does not exist where officers fail to "use[] reasonable judgment and conduct[] a proper investigation").

### 4. Defendants' Argument for Probable Cause Fails

Defendants' argument that they are entitled to a finding of probable cause at summary judgment fails. Once the disputed facts about the origin of the gunshot are excised, Defendants'

---

[1] On the facts here, there is a jury question about whether all of the Defendant Officers knew of the Briefing regarding gang conflict and Charger shootings. In any case, the Court must consider the collective knowledge of the invesigative team (including facts that negate or undermine probable case) when assessing probable cause. *See Nafzger*, 974 F2d at 911*; see also United States v. Hensley*, 469 U.S. 221, 232 (1985).

case for probable cause amounts to a grab bag of innocuous facts, nearly all of which are also disputed and many of which are not reasonably regarded as inculpatory at all. Defs Mem 4-15. *See Washington v. Haupert,* 481 F.3d 543, 551 (7th Cir. 2007) (affirming denial of summary judgment because there was "room for differences of opinion concerning" "the question of probable cause," so "[s]ummary judgment [was] not appropriate").

At summary judgment, the Court may not rely on the notion that the shot was fired inside Plaintiff's car as a factor supporting probable cause, because Plaintiff has adduced facts showing Defendants could not have reasonably concluded that the shot was fired in Plaintiff's car. *See supra* I.A.2. To be sure, the bare fact that Plaintiff was in the car when the victim was shot does not permit an inference that the shot was fired there. "[P]hysical proximity to a suspected crime, without other indicia of [the suspect's] involvement, is insufficient to support a finding of probable cause." *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (quoting *United States v. Ingrao*, 897 F.2d 860, 863 (7th Cir. 1990)). Once the allegation that the shot must have been fired inside Plaintiff's car is knocked out of the equation—as it is in this posture—there is no reasonable basis to ignore evidence pointing at the black sedan and away from Plaintiff.

All Defendants are left with are supposed "inconsistencies" between the video and Plaintiff's memory when speaking to police three months after the shooting, his wife's unfortunate but innocent decision to clean blood from the car without his knowledge, his failure to call 911 on a night of police-related chaos, and three criminal convictions from decades ago.[2] None supports probable cause when considered against the whole picture of Plaintiff's actions at the hospital after

---

[2] "Being a convicted felon is not itself indicative of criminal activity." *United States v. Glover*, 755 F.3d 811, 817 (7th Cir. 2014). If knowledge of a suspect's "previous records" alone "constitute[s] probable cause," then "anyone with a previous criminal record could be arrested at will." *Beck v. Ohio*, 379 U.S. 89, 97 (1964) (reversing and remanding where there was not probable cause to arrest a suspect).

the shooting, *supra* I.A.1, that there is no evidence the shot was fired inside Plaintiff's car, *supra* I.A.2., and much evidence that it came from the other one, *supra* I.A.3.

<u>*Supposed "Inconsistencies" in Plaintiff's Memory*</u>. Most of Plaintiff's supposed "inconsistencies" are figments of Defendants' imaginations. There is a factual dispute about whether there is any discrepancy at all. *See generally* PRDSF 41. This means they are out of Defendants' probable-cause calculus at summary judgment. Specifically, Defendants say Plaintiff's description of when the two cars arrive at the intersection is wrong, Defs Mem 9, but it is Defendants who misinterpret the video—Plaintiff's car arrives first and stops before the black one shows up, PRDSF 26a, 26b; PSF 6, 7. Defendants say that Plaintiff told them that the car in the next lane was beige, Defs Mem 9, but Plaintiff actually said that he only glanced briefly at the other car and could not clearly remember its color; Plaintiff only provided a "clean" answer that it was light colored after Defendants (who had the benefit of studying the video and knew that it was black) goaded him into adopting this "inconsistency." PRDSF 40g. Defendants say that Plaintiff told the detectives that the sedan went straight northbound through the intersection, Defs Mem 9, but Plaintiff did not say that. What he said is that the black sedan was pointing in the same direction as his SUV and that, after the shot, it just "took off"—which is exactly what it did. PRDSF 40i, 43q. He never said he saw it follow him northbound past the light, nor did he deny that it turned onto 63rd Street. PRDSF 40i, 43q. Any reasonable officer would have understood this: Plaintiff explained that as soon as the shot was fired, he ducked down low to protect himself and was not looking out of the car, just as anyone would. PRDSF 40i. Defendants next say that Plaintiff denied being in a traffic accident, Defs Mem 10, but Plaintiff admitted that he felt his car hit something, he just did not know what it was, *see* PRDSF 41, 43s, and Defendant Evangelides himself pointed

10

out that this counted as a "traffic accident," *id*. These are all phantom "inconsistencies" that cannot be credited at summary judgment.

In addition, even where there is a small mismatch between Plaintiff's memory and the mountain of video evidence that Defendants studied before interviewing him, Defendants are not entitled to an inference those discrepancies indicate guilt —as opposed to a simple memory error three months after a near-death trauma. *See, e.g.*, PRDSF 40g, 41,43l (hazy memory that the car may have been light colored); PRDSF 43s, 40j (memory of the timing and location of U-Turn). Thus, for example, Defendants wildly speculate that because Plaintiff drove a minute down Stony Island before pulling a U-Turn (and misremembers this) he may have been spending that time hatching a plan to cover his tracks. Defs Mem 10. Preposterously, Defendants also surmise that Plaintiff took Herring to the ER as part of a plot to dispose of his body there, and not to save his life. *Id.* The Court cannot go along with these completely speculative inferences, especially when nothing about Plaintiff's subsequent behavior at the hospital supports these outlandish scenarios.

Similarly, Defendants contend that, based on supposed "discrepancies," like Plaintiff's hazy memory of the sedan's color, they formed a "reasonable belief that Plaintiff . . . fabricated the existence of a shooter pulling up in a car to his left," and that Plaintiff "simply struck a bit of luck, in that unbeknownst to him, there had been a car to his left, a *black* sedan." Defs Mem 10. This chain of reasoning is bewildering and implausible. Plaintiff's overall recollection of the events surrounding the shooting exactly matches what is on video—including that a car pulled up on his left at precisely the moment shown on video when ShotSpotter registered a gunshot. The fact that he didn't form a clear memory about that car's color (nor observe its specific path of travel following the shooting) does not allow a reasonable person to draw the wildly implausible inference that he was fabricating an alibi from whole cloth that somehow, miraculously, just

11

happened to match every other detail seen on video and the ShotSpotter report. Defendants' twisted logic makes sense only if one is in the grips of tunnel vision and has already decided, without evidence, that the shooter was inside Plaintiff's car. At summary judgment, the Court may not follow Defendants down that tunnel. *See Rainsberger v. Benner*, *913 F.3d 640, 649* (7th Cir. 2019) ("The totality of these circumstances supports nothing more than bare suspicion," and the Seventh Circuit "has emphasized that probable cause requires more than that.").

In addition, minor mismatches cannot be cherry-picked; they must be viewed in light of all of the things Plaintiff told detectives that *were* consistent with video, *see supra* I.A.1-.3, as well as other indicators that Plaintiff was doing his best to tell the truth, including that Plaintiff was willing to admit uncomfortable facts that a person covering his tracks would probably not disclose. *See, e.g.*, PRDSF 41, 43f (Plaintiff admits to taking looted groceries which, unbeknownst to him, were visible in his trunk on video); PRDSF 43n (Plaintiff acknowledges that he didn't see the gun before he heard the shot). Moreover, the Court must consider these "mismatches" against the backdrop of Plaintiff's conduct at the hospital and afterwards, which does not indicate consciousness of guilt.

Finally, the supposedly inculpatory "inconsistencies" are on video. The jury is entitled to watch that video, hear all the facts, and draw its own conclusion about Plaintiff's truthfulness and whether any supposed discrepancies exist or are indicative of guilt. *See, e.g.*, *McCottrell v. White*, 933 F.3d 651, 661 n.9 (7th Cir. 2019) (vacating summary judgment because when "poor quality video conflicts with the testimony of the plaintiffs," the court must "credit the plaintiffs' version of events on summary judgment").

The interrogation itself is also on video. Plaintiff submits that a reasonable jury can and will conclude that the person seen in that interrogation room is an innocent man doing his level best to tell police what he knew. The jury will also see Defendants attempting to manipulate and

intimidate Plaintiff with lies. And, at the end of the video, the jury will see that when Defendant Evangelides finally puts his cards on the table and directly accuses Plaintiff of murder, Plaintiff exhibits genuine shock and disbelief—just as one would expect a falsely-accused person to do. *See generally* DX43 (ERI Interview), ECF No. 149-30. These are fact questions for a jury, not disputes that can be resolved at summary judgment. *See Sornberger,* 434 F.3d at 1017-19.

    *Plaintiff's Wife Cleans Some of the Blood.* Defendants point to the fact that Plaintiff's wife, Jackie Anderson, cleaned some of the blood in the car. But they ignore other facts that negate an inculpatory inference. First, whatever "cleaning" happened obviously was not designed to destroy the relevant evidence, but simply to clean up pooled blood. PRDSF 61. The blood stains remained plainly visible (and testable) in the car. DSF 30-31. Second, Jackie provided police a perfectly reasonable explanation for cleaning the vehicle: there was a large amount of blood and she thought they would continue to use the car. PRDSF 61. Third, Plaintiff did not know his wife had cleaned the car until after she did so, and his explanation about how he reacted—he told her she should have just left it because police would come and get it, PRDSF 41—is in fact consistent with his other decisions about how to handle the vehicle: he left it right in front of his house. DSF 29. These facts all undermine any inference that his wife's independent decision to clean up some of the blood somehow indicated Plaintiff's consciousness of guilt.

    *Plaintiff's Choice Not To Call Police.* Defendants put a great deal of weight on the fact that Plaintiff did not call the police after the shooting, returning to this theme over and over. Defs Mem at 1, 7, 9, 10, 11, 13. Under the circumstances, however, it is not reasonable to view Plaintiff's action as consistent with guilt. As noted already, Plaintiff did everything he could to save Herring's life—he got him in the hands of EMTs within minutes of the shooting, he sought out hospital officials to provide information and answer questions, and he then left his car out in front of his

13

house. When police impounded the car, he did not hide. When, three months later, police finally bothered to contact him, he agreed to talk. This is not a person evading authorities.

In addition, it was objectively reasonable for Plaintiff to not call police. As he explained to Defendants, Plaintiff simply did not trust the Chicago police and did not want to get involved with them. PSF 20; PRDSF 41, 43v.[3] Plaintiff, like most in his community, well knew the history of false arrests, fabricated prosecutions, and other abuse that Black men on the South Side have suffered at the hands of police. PSF 20. It is reasonable that an innocent person in Plaintiff's position would not see CPD as a source of help for anyone. The choice not to contact police was particularly reasonable in the aftermath of the George Floyd murder, on a night when the City was in a state of chaos over long-simmering tensions between CPD and communities of color.[4] Not calling police under these circumstances cannot be reasonably viewed as evidence of guilt.

Defendants have not shown they are entitled to summary judgment on probable cause.

## B. SUFFICIENT FACTS REBUT A PRESUMTION OF PROBABLE CAUSE

Defendants next argue that they are entitled to a presumption of probable cause because a court found probable cause to detain Plaintiff, prosecutors approved murder charges against Plaintiff, a judge decided Plaintiff should be held on no bond, and a grand jury returned an indictment against Plaintiff. *See* Defs Mem at 19-20.

As the Seventh Circuit has long held, however, none of these decisions shield Defendants from liability, where, as here, each decision was tainted by Defendants' misconduct. "[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to

---

[3] *Accord Petit v. City of Chicago*, 352 F.3d 1111, 1115 (7th Cir. 2003) (recounting expert testimony that "among Chicagoans, nonminorities have more favorable opinions about the CPD than do minorities. Distrust and a lack of confidence in the police . . . reduce the willingness of some community members to cooperate with the police.").

[4] Many courts have recognized that police may not to draw an inference of criminality under these circumstances, particularly during the summer of 2020. *See, e.g.*, *United States v. Coleman*, No. 20 CR 742, 2021 WL 3910141, at *3 n.4 (N.D. Ill. Sept. 1, 2021); *United States v. Chivers*, No. 1:19-cr-119, 2020 WL 5757135, at *12 (S.D. Ohio Sept. 28, 2020); *United States v. Bullock*, No. 20-cr-2018, 2020 WL 5553562, at *13 (N.D. Iowa Aug. 21, 2020).

14

drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision." *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988).

### 1. August 30 *Gerstein* Hearing

Plaintiff can rebut a presumption of probable cause where defendants (1) knowingly or intentionally or with reckless disregard for the truth made false statements to the judicial officer, and (2) the false statements were necessary to the judicial officer's determination of probable cause. *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003). In this context, "reckless disregard for the truth" is demonstrated by showing that officers had obvious reasons to doubt the accuracy of the information reported or failed to inform the judicial officer of facts they knew would negate probable cause. *Id.*

The probable cause statement that Defendant Potter submitted to the court at Plaintiff's *Gerstein* hearing contained a crucial false and misleading statement: "investigation revealed that the gunshot had come from within [Plaintiff's] vehicle." PSF 43. In reality, there was no basis to conclude the gunshot was fired in Plaintiff's car. *See supra* § I.A.2. Defendants contend that the appearance of the black sedan's window as it drives through the intersection excludes the as the source of gunfire, but this contention lacks merit. As Defendants knew (and as ASA Waller later realized when he reviewed the full record, see PSF 49), the shooting happened when both cars were off camera, so there was no way to know if black sedan's windows were up or down when the gun was fired. PSF 10, 12; *see also* PRDSF 27 (disputing that rear windows are rolled up).

In addition to making this false statement, Potter provided no facts whatsoever about the black sedan and concealed ample facts that negate probable cause: Plaintiff explained the shot was fired from a car that pulled up along alongside; the POD video corroborated his account; at the moment the gun was fired (11:46:28pm), the bodies of both cars were off camera and did not show

15

the windows; a black Dodge charger consistent with the black sedan on the POD video was carjacked at gun point 45 minutes prior to and three blocks away from the shooting; black Dodge Chargers were involved in nearby similar shooting incidents on June 2 and June 3; the Medical Examiner's June 6 post-mortem examination found no evidence of close range gun fire; Plaintiff sought out security at the hospital; and his statements to police were largely consistent with other evidence police knew. *Supra* § I.A.1, I.A.4; PRDSF 40a-n,41, 43a-z.

These false and misleading statements were plainly material to the probable cause determination. Probable cause hinged entirely on whether the shot came from the black sedan or Plaintiff's car. Potter's false statement combined with his failure to disclose the existence of the black sedan and facts supporting a conclusion that the gun was fired from it was not just material—it was game over for Plaintiff.

## 2. August 31 Bond Hearing

Defendants also argue that Plaintiff's bond court hearing also somehow defeats Plaintiff's claim, see Defs Mem at 19, but this argument is also unavailing. As an initial matter, it is not clear that the bond court made a probable cause determination. Plaintiff acknowledges that at the outset the judge references a finding of probable cause, but the context of that statement supports an inference that he was referencing the prior August 28 probable cause hearing. *See* DSF 56.

Even if the bond hearing could be construed as a new judicial determination of probable cause, it too was tainted by the officers' misconduct. At the bond hearing, the State proffered evidence that CCSAO felony review ASAs had obtained from detectives between August 28 and August 30, and those facts are reflected in the CCSAO "Fact Sheet." *See* DSF 48, 49, 56 (referencing the CCSAO fact sheet, DX48). The CCSAO Fact Sheet demonstrates that detectives did not tell prosecutors about any of the following: at the moment the gun was fired (11:46:28pm), the video did now show the black sedan's windows; the black sedan appeared consistent with a

16

Dodge Charger and a black Dodge Charger was carjacked at gun point 45 minutes prior to and three blocks away from the shooting; black Dodge Chargers were involved in nearby similar shooting incidents on June 2 and June 3; the Medical Examiner's June 6 post-mortem examination found no evidence of close range gun fire; Plaintiff spoke to officials at the hospital; and Plaintiff's statements to detectives were largely consistent with video evidence.

Indeed, at the bond hearing, the State was clearly misled by detectives' failure to disclose their knowledge that the shooting happened while both cars were off video. As part of its proffer, the State falsely reported that "[the black sedan] didn't fire the shot because its windows were up and that was on video." DX56 at 5:6-7. The State also focused on Plaintiff's purported statement that the shooter was in a "tan" car, without disclosing the fact Plaintiff's initial response to Defendants' question was that he could not remember the color, and that Defendants goaded him into adopting the color of the car as tan. PRDSF 43l.

### 3. September 17 Grand Jury Indictment

The grand jury indictment also does not defeat Plaintiff's claim because Defendant Evangelides gave false testimony and concealed information from ASA Rubio, who prepared his testimony and presented him to the grand jury.

Like ASA Murphy, ASA Rubio had information about the investigation that was contained within the CCSAO Fact Sheet. PSF 48. Prior to presenting Evangelides to the grand jury, she had reviewed the CCSAO Fact Sheet and had two conversations with him. PSF 47-48. During one of the meetings, the two went over a script of the questions that ASA Rubio would ask him—there were no surprises in the grand jury and ASA Rubio gave Detective Evangelides no indication that he could not be as forthcoming as he wanted about his investigation. PSF 47. During these conversations, Defendant Evangelides did not tell ASA Rubio that Plaintiff sought help from hospital security, nor that his account was largely consistent with evidence obtained during his

investigation, nor or that that the shots were fired off camera, nor about any other crimes involving black Dodge Chargers, nor the Medical Examiner's determination that there was no evidence of close range gunfire. PSF 46.[5]

Likewise, no information was provided to the grand jury about these facts, which all tend to negate probable cause. *See* DSF 60. Instead, the only material information the grand jury was provided was a false conclusory statement from Evangelides: That his investigation revealed that Plaintiff shot Herring in the head, see DSF 60(b).

### 4. Defendants' False and Misleading Statements and Omissions Were Material To Probable Cause

Defendants do not contend with any of the misleading statements or material omissions referenced above. Instead, Defendants focus singularly on ShotSpotter evidence and argue that Defendants' misstatements about ShotSpotter were not material to probable cause determinations. *See* Defs Mem at 147 at 16-18. However, as demonstrated above, Defendants' misleading statements and omissions go beyond far beyond the ShotSpotter report.

The Seventh Circuit uses a straightforward method to determine whether alleged lies or omissions are material to a finding of probable case: "We eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting 'hypothetical' affidavit would establish probable cause." *Rainsberger*, 913 F.3d at 647 (quoting *Betker v. Gomez*, 692 F.3d 854, 862 (7th Cir. 2012)).

If the grand jury did not hear Evangelides' misleading conclusory statement (that his investigation revealed that Plaintiff shot Herring in the head) and instead heard all the facts,

---

[5] One of the questions ASA Rubio asked suggests that Defendant Evangelides misled her about Plaintiff's account of events. She elicited testimony, through a leading question, that "Plaintiff gave a statement to police that the victim was shot by an unknown person while in traffic," but Plaintiff never described the shooting as happening "in traffic" and was very specific that it occurred when a car pulled up next to his at the stoplight. PRDSF 60h.

including those tending to show that the gun was fired from the black sedan, that Plaintiff's account was largely consistent with objective video evidence, and about his actions at the hospital, the grand jury would be left with only the facts described *supra* I.A.4, which do not establish probable cause.

### 5. Prosecutors' So-Called "Independent Review" Does Not Break the Chain of Causation

Finally, Defendants argue that they cannot be held liable because CCSAO felony review prosecutors made the decision to approve murder charges against Plaintiff based on their own "independent review." This argument is unsupported by facts and law, and it must be rejected.

#### a. ASA Taczy Relied Entirely on Information Filtered Through Defendants

ASA Taczy's job was to review evidence detectives gave him to determine if there was probable cause to charge Plaintiff. PSF 38. Contrary to Defendant's suggestion, ASA Taczy did not undertake his own investigation; he only reviewed evidence that police provided. PSF 40. At his deposition, he testified that he relied on police to be honest about their investigation and to disclose material information to him. PSF 38. He had no memory of what evidence he saw—he "might have" seen the POD video but could not say whether he saw any other footage. PSF 40.

When Defendants asked ASA Taczy to approve murder charges on August 28, he told them to keep investigating. Among other things, he told them to (a) interview Plaintiff's wife and (b) interview the Medical Examiner about evidence of close-range gun fire. DSF 49.

Defendant Reiff and Defendant Evangelides then went to interview Jackie Anderson, during which they told Jackie she knew Plaintiff was guilty and threatened to arrest her. PSF 41. Reiff wrote a summary of what Anderson supposedly said to him, which CCSAO Fact Sheet repeats Reiff's summary almost verbatim, showing that ASA Taczy simply adopted what detectives told him, without independently speaking to witnesses. PSF 42.

19

Defendants then misrepresented what the Medical Examiner's office told Defendant Lapadula during the interview. Defendants Evangelides and Lapadula claim that Dr. Khan told Lapadula that the gun could have been fired within 1-2 feet of Herring. PRDSF 4d. Dr. Khan does not recall the conversation with Lapadula, but she testified it was never her opinion that the gun could have been fired within 1-2 feet and she had no recollection of ever telling anyone that. *Id.* To the contrary, Dr. Khan determined during her June 6 examination that there was no evidence that the gun was fired from within 3-4 feet of Herring and the shot was likely fired from a distance of 4-5 feet of more. PSF 31.[6] There is no indication that Detectives gave ASA Taczy or anyone else a truthful account of Dr. Khan's determination, and a reasonable jury can conclude that Defendants lied to ASA Taczy about what they learned from Dr. Khan, and when ASA Taczy was asked in this litigation if there was probable cause to charge Plaintiff with murder, he refused to answer. PSF 58.

### b. Defendants' Reliance on *Washington* Is Misplaced

Contrary to Defendants' assertion, ASA Taczy's review was nothing like ASA Waller's review in *Washington v. City of Chicago*, 98 F.4th 860 (7th Cir. 2024). In that case, the Plaintiff alleged that detectives made false statements about what witnesses said when interviewed but, prior to approving murder charges, ASA Waller also personally interviewed them himself. *Id.* at 873-74. There, the Seventh Circuit appropriately cast the ASA's role as "independent fact-gathering," that broke the chain of causation stemming from detectives' misconduct. *Id.* at 874.

In this case, ASA Taczy did no "independent fact-gathering." Unlike ASA Waller in *Washington*, ASA Taczy did not interview the defendant or eyewitnesses—instead he relied on

---

[6] Detectives also reported false information about hospital bandaging making it difficult to determine range of gunfire, but again Dr. Khan does not recall saying that, she would have no basis to say it, her report has no reference to it, and it is untrue as a factual matter. PSF 58.

detectives to interview witnesses, who in turn lied to him about what those witnesses said. And of course ASA Taczy could not review evidence that detectives did not provide to him, for example, documentation showing that the shooting happened at 11:46:28 (off camera), information about the black Dodge Charger carjacked at gunpoint just a few blocks away and 45 minutes before the shooting, other contemporaneous crimes involving Dodge Chargers, and Dr. Khan's June 6 determination that there was no evidence of close range gun fire.

This case is like *Stephenson v. City of Chicago*, No. 21 CV 338, 2024 WL 3251346 (N.D. Ill. July 1, 2024), where defendant officers also argued that CCSAO's felony review prosecutors broke the chain of causation. *Id.* at *8. Like ASA Taczy, the *Stephenson* ASA did not personally obtain the witness statements that formed the basis of probable cause—rather, she relied on information filtered through detectives, which the court viewed as a key distinction from ASA Waller's review in *Washington*. *Id.* Relying on the distinction, the court rejected the attempt to use CCSAO's felony review process to shield officers from liability. *Id.*; *see also Brown v. City of Chicago*, No. 19 CV 4082, 2025 WL 2785426, at *20 (N.D. Ill. Sept. 30, 2025).

## II.   PLAINTIFF'S MALICIOUS PROSECUTION CLAIMS MUST PROCEED

Plaintiff asserts malicious prosecution claims against Defendants under Section 1983 and state law. As Defendants note, the elements for both claims are the same, except that state law has a favorable termination requirement that Section 1983 does not. Because Plaintiff can satisfy all elements of the state law claim (and by extension, all elements of the Section 1983 claim), Plaintiff analyses these claims by reference to the state law elements.

To prevail on a state law malicious prosecution claim, Plaintiff must show: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of

probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 74, 183 N.E.3d 767, 782.

Defendants argue that they are entitled to summary judgment because, according to them, plaintiff cannot establish the absence of probable cause, plaintiff cannot establish malice, and plaintiff cannot establish favorable termination. Defs Mem at 25. Each argument fails.

### A. A Jury Can Find the Absence of Probable Cause

As discussed above, a jury can easily find that there was no probable cause in this case. No evidence puts the gunshot inside Plaintiff's car and no evidence excludes a drive-by shooting by someone in the black Charger. Plaintiff's actions after the shooting are consistent with an innocent man, not a murderer. None of the supposed "inconsistencies" in Plaintiff's recollection are inculpatory, and his decision not to call 911 does not indicate guilt. The jury will find that no prudent officer could have concluded that Plaintiff was the shooter.

### B. A Jury Can Find Malice

Malice exists when a prosecution is initiated for "any reason other than to bring the responsible party to justice." *Beaman*, 2021 IL 125617 ¶ 141, 183 N.E.3d at 792. Malice does not require "personal ill-will, spite or hatred toward the person prosecuted." *Holt v. City of Chicago*, 2022 IL App (1st) 220400 ¶ 89, 214 N.E.3d 877, 906. Malice may be inferred from circumstantial evidence as it "necessarily rests on inferences and deductions from the facts that are heard by the trier of fact." *Beaman*, 2021 IL 125617 ¶ 142, 183 N.E.3d at 793. "[W]here two conflicting inferences may be drawn from the evidence—one of good-faith actions on the part of the defendant and the other of actions inconsistent with good faith or, in other words, malicious actions—the question whether the defendant acted with malice is for the trier of fact to determine." *Id.*

This case involves ample facts to support a jury finding that defendants sought murder charges against Plaintiff so that they could clear the case, and not to bring the responsible party (in

the black sedan) to justice. Detectives had information about the black Dodge Chargers carjacked at gunpoint and involved in similar gang-related shooting incidents. PSF 23-28. Defendants had information about an alternative suspect (Patton) who was in the gang, had a history of violence, and was trying to set Herring up. PSF 32-34; PRDSF 12. Defendants had ample tools at their disposal for pursuing these leads, but disregarded them, focusing exclusively on building a case against Plaintiff. PSF 29, 34-36. Defendants did not even obtain the medical examiner's opinion about range of fire until three months after the shooting, when the ASA required them to do so, and they then made false statements about what they learned from the medical examiner. PSF 30-31, 57; PRDSF 4(e). Defendant Potter lied in a number of search warrant applications (falsely stating that Defendant "quickly fled" the hospital), and Evangelides lied in his final cleared close report (misrepresenting the ShotSpotter evidence and Medical Examiner's opinion to support the conclusion that the shot was fired inside Plaintiff's car). PSF 55, 57. On top that, Plaintiff has adduced evidence of Defendants' incentive to "clear" cases, which occurs when prosecutors approve charges against a suspect. PSF 51-54, 59-62.

Inadequate one-sided investigations can support an inference of malice. In *Beaman*, the Illinois Supreme Court held that genuine issues of material fact existed as to whether detectives acted with malice by prematurely focusing on the plaintiff without excluding other viable suspects. *Id.* at ¶ 144, 183 N.E.3d at 793. The plaintiff presented evidence that officers "intentionally ignored, shaped, interpreted or created evidence" to fit their theory of guilt. *Id.* at ¶ 149, 183 N.E.3d at 794. The officers' decision to "go forward carelessly or recklessly with previously commenced proceedings, after receiving notice of a problem" was sufficient to infer malice. *Id.* at ¶ 142, 183 N.E.3d at 793. *See also Jackson v. City of Chicago*, No. 22 C 4337, 2024 WL 5264703, at *6 (N.D. Ill. Dec. 31, 2024) (holding that "a jury could infer malice based on

23

circumstantial evidence that [detectives] manufactured evidence during their surveillance and investigation"). The facts of the one-sided and dishonest investigation Defendants conducted supports an inference that they were trying to clear the Herring homicide investigation on Plaintiff as opposed to find and prosecute the true perpetrator.

### C. A Jury Can Find Favorable Termination

Under well-established Illinois case law, "a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a *nolle prosequi*, unless the abandonment is for reasons not indicative of the innocence of the accused." *Beaman*, 2021 IL 125617, ¶ 109, *reh'g denied* (Sept. 27, 2021) (citing *Swick v. Liautaud*, 169 Ill.2d 502, 513 (1996)). A nolle is "indicative of . . . innocence" where surrounding circumstances show that a prosecutor "lacked reasonable grounds to pursue the criminal charge." *Id.* at ¶ 109.

Tellingly, Defendants advance no argument at all on this element, stating simply: "This litigation highlights that questions regarding Plaintiff's innocence have not been answered." Defs Mem at 26. *See Donnelly v. Chicago Park Dist.*, 417 F. Supp. 2d 992, 1005-06 (N.D. Ill. 2006) (perfunctory undeveloped argument insufficient to shift summary judgment burden). Nevertheless, ample facts in the record support a jury finding that the criminal proceedings terminated in Plaintiff's favor. The State's Attorney's Office dismissed charges after ASA Waller concluded, in a detailed internal memo, that the State lacked evidence of guilt against Plaintiff. PSF 48. Significantly, ASA Waller noted there was no evidence to support a conclusion that the gunshot was fired in Plaintiff's car, that Plaintiff's statement to the police was exculpatory, and that Plaintiff's actions (taking Herring to the hospital, going inside, waiting there for 5 minutes, and talking to hospital staff) did not show consciousness of guilt. *Id.* These and other admissions by the prosecution are more than sufficient to support a finding that the charges were dismissed in a manner indicative of Plaintiff's innocence. *Gardley v. City of Chicago*, No. 20 C 5149, 2022 WL

6757610 at *9 (N.D. Ill. Oct. 11, 2022) (similar statements from ASA precluded summary judgment); *see also Beaman*, 2021 IL 125617, ¶ 110, 183 N.E.3d at 788; *Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 794 (N.D. Ill. 2013); *Coleman v. City of Chicago*, No. 17-CV-08696, 2025 WL 2410325, at *29 (N.D. Ill. Aug. 20, 2025); *Fulton v. Bartik*, No. 20 C 3118, 2024 WL 1242637, at *33 (N.D. Ill. Mar. 22, 2024).

## III.   THERE IS SUFFICIENT EVIDENCE OF PERSONAL INVOLVEMENT BY DEFENDANTS RONEY, REIFF, AND LAPADULA

Defendants Reiff, Roney, and Lapadula argue they are entitled to summary judgment because they had limited roles in the investigation, but this argument lacks merit.

Although Evangelides was the lead detective, each of the defendants worked together as a well-functioning dynamic team, constantly sharing information. PSF 49. As the team's leader, Roney communicated regularly with his team (and in turn with his supervisor, Lieutenant Valdez) in detail about substantive aspects of the Herring homicide investigation, including what direction the investigation should go and whether there was probable cause to arrest Plaintiff. PSF 51-52; PRDSF 4(e). In the days following the shooting, Roney personally learned about the black Dodge Charger that was carjacked at gunpoint minutes before Herring was shot as well as other similar shootings involving Dodge Chargers soon after Herring was shot. Furthermore, as Defendants admit, they decided by early June that Plaintiff was their suspect—their only purpose in interviewing him in August was to rule out a legal defense (self-defense or an accident). Defs Mem at 13; PSF 37. Furthermore, Defendant Potter testified that Roney participated or had input into the decisions to arrest and seek murder charges against Plaintiff. PSF 50; PRDSF 4(e). Thus, even if Roney was not physically present for the arrest, sufficient evidence exists to establish his personal involvement. *See Maltby v. Winston*, 36 F.3d 548, 559 (7th Cir. 1994) (personal

involvement satisfied where act causing constitutional deprivation occurs at defendant's direction or with his knowledge and consent; defendant's direct participation is not required).

Defendants Reiff and Lapadula were also members of Evangelides' and Roney's team. Their personal involvement is established because they acted or failed to act with deliberate or reckless disregard for Plaintiff's constitutional rights. *Id.* Although they did not become actively involved until late August 2020, they were briefed on the case when they joined, and they shared the goal of clearing the case. PSF 53-54. Defendant Reiff's contention that he did not personally pose many questions during the interviews does not negate his personal involvement—as *Maltby* establishes, personal involvement can be established by failure to act. Furthermore, facts in the record show that Reiff participated in the decision to arrest and seek charges against Plaintiff, PSF 50; PRDSF 4(e), and when he and Evangelides interviewed Plaintiff's wife Jackie, they repeatedly told her that she knew Plaintiff was guilty and threatened to arrest her. PSF 41.

Plaintiff acknowledges that Defendant Lapadula was not involved in the decision to arrest or seek charges, but facts in the record show that he falsely reported Dr. Khan's opinion after ASA Taczy told Defendants to interview her. PRDSF 4(d); PSF 57. When Lapadula made the call, he knew that Plaintiff was in custody, that his teammates had already asked prosecutors to approve murder charges, and that the ASA wanted Dr. Khan's opinion about range of gunfire first. PRDSF 4(d). A jury could easily conclude that Lapadula did not truthfully report Dr. Khan's opinion because it would have exculpated Plaintiff and tanked Defendants' efforts to clear the case.

## IV.    PLAINTIFF'S CONSPIRACY CLAIMS MUST PROCEED

Defendants contend, with scant argument or analysis, that they are entitled to summary judgment because "there is no evidence of an agreement or meeting of the minds between Defendant Officers evidencing a conspiracy to unlawfully seize Plaintiff without probable cause." Defs Mem at 25. Defendants' position misunderstands that law and facts.

To show an agreement sufficient to defeat summary judgment, Plaintiff need only provide evidence to show that defendants were "voluntary participant[s] in a common venture." *Jones,* 856 F.2d at 992. Plaintiff need not show that defendants "agreed on the details of the conspiratorial scheme." *Id.* It is enough that defendants "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [their] part to further them." *Id.* Circumstantial evidence may "provide adequate proof of conspiracy." *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981); *see also Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979) ("[T]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives") (internal quotation marks omitted) (overruled on other grounds).

Here, a jury could find that defendants were voluntary participants in a common venture to clear the Herring homicide investigation by obtaining murder charges against Plaintiff, without regard to existence of true probable cause. In furtherance of their agreement, they made false and misleading statements about their investigation, disregarded investigative leads pointing to other suspects, and withheld information from prosecutors. PSF 29-47. Defendants worked together as a team toward the goal of "solving" the Herring homicide—discussing it, sharing information, and jointly making decisions about next steps. PSF 49-51; PRDSF 4(a)-(e). When Defendants sought charges from ASA Taczy, he asked them to conduct more interviews. Evangelides, Reiff, and Lapadula threatened Plaintiff's wife and then fudged Dr. Khan's opinion to obtain approval for charges. PSF 41-42; PRDSF 4(e). These facts are sufficient to preclude summary judgment. *See Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018) (overruled in part on other grounds); *Hill v. City of Harvey*, No. 17 C 4699, 2020 WL 5800729, at *5 (N.D. Ill. Sept. 29, 2020).

## V.     PLAINTIFF'S FAILURE TO INTERVENE CLAIM MUST PROCEED

Defendants argue that they are entitled to summary judgment on Plaintiff's failure to intervene claim, resting entirely on their arguments about the existence of probable cause and lack of personal involvement by Roney, Reiff, and Lapadula. *See* Defs Mem at 26. For all the reasons that Plaintiff explains above, however, facts support a jury finding that Plaintiff was seized without probable cause and that Roney, Reiff, and Lapadula were personally involved in the constitutional violation. Furthermore, contrary to Defendants' assertion, Plaintiff does differentiate the misconduct he ascribes to each officer, *see supra* § III, and he does not seek to hold any defendant liable for failing to intervene in that defendant's own misconduct.

## VI.     DEFENDANTS ARE NOT IMMUNE

To determine whether a defendant is entitled to qualified immunity, courts must address two issues: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In 2020, Plaintiff's right to be free from seizure without probable cause was clearly established. *Sornberger*, 434 F.3d at 1013 (citing *Beck*, 379 U.S. at 91). When qualified immunity is asserted, "the relevant question is whether a reasonable officer could have believed that probable cause existed to make the arrest." *Sornberger*, 434 F.3d at 1013 (quotation omitted).

When the facts are viewed in the light most favorable to Plaintiff, a reasonable officer could not have believed there was probable cause. In short, Plaintiff's account of the shooting matches what is on video. There is no evidence the shot came from Plaintiffs' car. His post-incident conduct is not consistent with someone who committed murder. Meanwhile, there was ample evidence pointing at the black Charger. As against all this, it is not reasonable for any officer to find probable cause from the few innocuous facts that remain. *Cf. Sornberger*, 434 F.3d at 1014-16.

28

It was also clearly established that "the probable cause standard [does not] allow the defendants to rely on facts without regard to the full context of the circumstances known to them," *Fox*, 600 F.3d at 834 (citing *Guzell v. Hiller*, 223 F.3d 518, 520 (7th Cir. 2000)). Here, defendants cherry-picked supposedly inculpatory facts ignored all of contrary evidence. *See supra* § I.A. In addition, "reasonable avenues of investigation must be pursued' especially when . . . it is unclear who committed the crime." *Sornberger*, 434 F.3d at 1016; *Moore*, 754 F.2d at 1345-46. Here, defendants utterly failed to investigate obvious possibilities. *Supra* §§ I.A.3, II.B; PSF 29, 34-36.

It was likewise clearly established that knowingly fabricated evidence and false statements cannot support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013); *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing grant of summary judgment where false statements precluded finding probable cause); *Jones*, 856 F.2d at 995 (immunity denied when police used false evidence because "[t]he facts show conduct that no reasonable police officer would have engaged in"); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (when officer intentionally or recklessly includes false facts or omits facts in the probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). Defendants cannot obtain qualified immunity on this record because, where there is evidence that officers "manipulated the available evidence to mislead" judicial or prosecutorial authorities, officers are not entitled to qualified immunity. *Sornberger*, 434 F.3d at 1016; *supra* §§ I.B, II.B (describing lies and manipulation of prosecutors, court, and grand jury.).

Defendants' qualified immunity argument also simply fails to credit Plaintiff's view of the facts. Defs Mem 28-29 (asking the court to adopt the facts "as recited in Section I" of its memorandum). At summary judgment, the Court must resolve disputes and draw inferences in Plaintiff's favor, including on questions of immunity. *See Williams*, 733 F.3d at 757; *Chelios v.*

*Heavener*, 520 F.3d 678, 691-92 (7th Cir. 2008); *Flowers v. Renfro*, 46 F.4th 631, 634 (7th Cir. 2022) (jury must resolve questions bearing on qualified immunity analysis); *Hurt*, 880 F.3d at 841.

Defendants also claim Plaintiffs cannot point to clearly established law that is on point, but this is a red herring. *First*, Defendants try to cast this as a novel case because it involves ShotSpotter, but Defendants do not rely on ShotSpotter for probable cause and none of Plaintiff's arguments turn on ShotSpotter. *Second,* Defendants appear to argue that they are entitled to qualified immunity unless there is a prior case where officers were presented precisely the same set of facts as here. Defs Mem 28. That is not the law. *See Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (Fourth Amendment rights are well established "even in the absence of earlier cases involving fundamentally similar or materially similar facts"); *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009). On Defendants' view, every Fourth Amendment claim should lose on qualified immunity because, by their nature, every police investigation involves a unique set of facts.

Finally, Defendants ask the Court to enter summary judgment on their Tort Immunity Act 2-202 affirmative defense. Under Section 2-202, willful and wanton conduct is "a course of action which showed an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference or conscious disregard for the safety of others." 745 ILCS 10/1-210. Defendants' entire, perfunctory argument on this topic is that because there was probable cause, the conduct cannot have been willful and wanton. However, as demonstrated above, a jury could easily find that the Defendants lacked probable cause and lied to prosecutors, judges, and the grand jury about evidence, "includ[ing] the deliberate falsification of evidence"; that "satisf[ies] the requirement of willful and wanton conduct" and prevents summary judgment. *Harris v. Wainscott*, No. 18 cv 2789, 2019 WL 1995270, at *4 (N.D. Ill. May 5, 2019).

## CONCLUSION

For all of these reasons, summary judgment should be denied.

30

Dated: January 15, 2026

Respectfully submitted,

*/s/Jonathan Manes*
Jonathan Manes
Alexa Van Brunt
Roderick & Solange MacArthur Justice Center
160 E. Grand Ave, 6th Fl.
Chicago, IL 60611
(312) 503-0012
jonathan.manes@macarthurjustice.org
alexa.vanbrunt@macarthurjustice.org

Elizabeth Mazur
Hughes Socol Piers Resnick & Dym, Ltd
70 W. Madison, Suite 4000
Chicago, Illinois 60603
(312) 580-0100
emazur@hsplegal.com

Daniel Massoglia
Hannah Marion
First Defense Legal Aid
601 S. California Ave.
Chicago, IL 60612
daniel@first-defense.org
hannah@first-defense.org

## CERTIFICATE OF SERVICE

I, Jonathan Manes, an attorney, certify that I served a copy of Plaintiff's Memorandum in Opposition to Defendant Officers Motion for Summary Judgment on all counsel of record by filing on the CMECF system.

*/s/Jonathan Manes*